DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DALE NORMAN,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D12-3525

[February 18, 2015]

Appeal from the County Court for the Nineteenth Judicial Circuit, St. Lucie County; Cliff Barnes, Sr., Judge; L.T. Case No. 562012MM000530A.

Eric J. Friday of Fletcher & Phillips, Jacksonville, and Ashley N. Minton of Fender & Minton, P.A., Fort Pierce, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, Celia Terenzio, Bureau Chief, and Cynthia L. Comras, Assistant Attorney General, West Palm Beach, for appellee.

KLINGENSMITH, J.

The Second Amendment of the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court has determined that this text confers "an individual right to keep and bear arms." *Dist. of Columbia v. Heller* (*Heller I*), 554 U.S. 570, 577, 595 (2008). However, the Court in *Heller I* did not define the full extent of the right to bear arms. *Id.* at 626 (stating that "we do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment"). We are now being asked to venture into this "vast *terra incognita*"[1] of Second Amendment jurisprudence to answer a question of first impression, specifically, whether the Second Amendment forbids the State of Florida from prohibiting the open carry of firearms while permitting the concealed carry of weapons under a licensing scheme.

---

[1] "The whole matter [of the right to carry outside the home] strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dale Norman ("Defendant") was arrested while openly carrying a firearm. Video taken before his arrest showed that the gun was completely exposed to public view, in its holster, and not covered by Defendant's shirt. Defendant was subsequently charged with Open Carrying of a Weapon (a firearm) in violation of section 790.053, Florida Statutes (2012). The trial court initially reserved ruling on Defendant's motions to dismiss, and following a jury trial Defendant was found guilty of this charge. The county court considered Defendant's motions challenging the statute's constitutionality, and although the court ultimately denied these motions, it certified three questions of great public importance to this court:

> I. Is Florida's statutory scheme related to the open carry of firearms constitutional?
>
> II. Do the exceptions to the prohibition against open carry constitute affirmative defenses to a prosecution for a charge of open carry, or does the State need to prove beyond a reasonable doubt that a particular defendant is not conducting himself or herself in the manner allowed?
>
> III. Does the recent "brief and open display" exception unconstitutionally infect the open carry law by its vagueness?

Based on the reasons set forth below, we answer the first question by holding that section 790.053, which generally prohibits the open carrying of firearms, is constitutional. We answer the second question by holding that exceptions to the prohibition against open carry constitute affirmative defenses to a prosecution for a charge of open carry. Regarding the third question, we find no need to address whether the "brief and open display" exception unconstitutionally infects the open carry law by its vagueness because under the facts of the case this exception did not apply to Defendant. Therefore, we affirm the trial court's rulings.

I. The Constitutionality of Florida's Statutory Scheme Related to the Open Carry of Firearms

Defendant challenges section 790.053 by claiming it unconstitutionally infringes on his Second Amendment rights by prohibiting "the carry of firearms that are unconcealed even for those people to whom the state has issued a license to carry a concealed weapon or firearm." In other words, Defendant asserts that he has a constitutionally protected right to "keep and bear Arms," U.S. Const. Amend. II, that includes the ability to openly carry a gun outside the home for self-defense without the need for a permit. The constitutional validity of a law is a legal issue subject to *de*

2

*novo* review by this court. *See Scott v. Williams*, 107 So. 3d 379, 384 (Fla. 2013). To answer the questions certified to this court, we apply a two-step analysis.[2]

First, we determine "whether the challenged law burdens conduct protected by the Second Amendment based on a historical understanding of the scope of the [Second Amendment] right, or whether the challenged law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." *Jackson*, 746 F.3d at 960 (alteration in original) (citations omitted) (internal quotation marks omitted). To answer this question, "we ask whether the regulation is one of the presumptively lawful regulatory measures identified in *Heller* [*I*], or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (citations omitted) (internal quotation marks omitted). If the provision is not "within the historical scope of the Second Amendment," *id.*, then it is constitutional. *See id.*; *see also Nat'l Rifle Ass'n*, 700 F.3d at 195. If it is within the scope, we must proceed to the second step of the analysis.

At step two, we must "determine the appropriate level of scrutiny" to apply to the provision at issue. *Jackson*, 746 F.3d at 960. To this end, we look at "(1) 'how close the law comes to the core of the Second Amendment right [of self-defense]' and (2) 'the severity of the law's burden on the right.'"

---

[2] This two-step analysis has been employed by the majority of the federal circuit courts to consider Second Amendment challenges since the Supreme Court's decision in *Heller I*. *See, e.g., Tyler v. Hillsdale Cnty. Sheriff's Dep't*, No. 13-1876, 2014 WL 7181334, at *7, *17 (6th Cir. Dec. 18, 2014); *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 960-61 (9th Cir. 2014); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1150 (9th Cir. (2014); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 874-75 (4th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. Dist. of Columbia* (*Heller II*), 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chi.*, 651 F.3d 684, 702-03, 704-09 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). Other courts have declined to apply this two-part analysis. *See Moore v. Madigan*, 702 F.3d 933, 943 (7th Cir. 2012); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93-94 (2d Cir. 2012); *United States v. Booker*, 644 F.3d 12, 22-25 (1st Cir. 2011); *United States v. Masciandaro*, 638 F.3d 458, 469-70 (4th Cir. 2011); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010); *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010); *United States v. Rene E.*, 583 F.3d 8, 13-16 (1st Cir. 2009). These discrepancies in analysis are discussed more fully below.

*Id.* at 960-61 (quoting *Chovan*, 735 F.3d at 1138).  Moreover, in applying step two, we remain mindful that "[a] law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." *Id.* at 961 (alteration in original) (quoting *Heller I*, 554 U.S. at 629).

a.  Right to Carry Outside the Home

Under the two-step process outlined above, we must determine at the outset whether the activity under review, in this case, a citizen's ability to carry a firearm outside the home for the purpose of self-defense, falls within the scope of the Second Amendment right to "keep and bear arms." *See, e.g.*, *id.* at 960.  In light of recent pronouncements from the U.S. Supreme Court, this question is easily answered.

In *Heller I*, the Court held that the Second Amendment protected the possession of guns in the home for self-defense, thus striking down the District of Columbia's handgun ban.  554 U.S. at 635.  In the opinion of the Court, Justice Scalia wrote:  "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595.  After consulting the text's historical background and the public's general understanding of the provision, the Court concluded that the Second Amendment codified a pre-existing, individual right to keep and bear arms, recognizing that the "*central component* of the right" was self-defense. *See id.* at 592, 599.

The Court concluded that an exhaustive historical analysis of the full scope of the Second Amendment was unnecessary to decide the case. *Id.* at 626-27.  It also noted that there was no reason to specify for future cases which burdens on the Second Amendment right triggered certain standards of review, or whether a tiered-scrutiny approach was even appropriate in the first place. *See id.* at 628-29.  By any measure, the Court found that the District of Columbia's prohibition overreached. *Id.* at 634 (stating that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon").

Two years later, in *McDonald v. City of Chicago, Ill.*, the Supreme Court examined a handgun ban enacted by the City of Chicago.  561 U.S. 742, 750-51 (2010).  The question presented in that case was whether a state government was subject to the strictures of the Second Amendment. *Id.* The Court struck down Chicago's handgun ban, concluding that the

4

Second Amendment imposed restrictions not only on the federal government but, under the Fourteenth Amendment, the states as well. *Id.* at 791.

Last year, in *Peruta v. County of San Diego*, the Ninth Circuit noted that "[t]he Second Amendment secures the right not only to 'keep' arms but also to '*bear*' them." 742 F.3d at 1151. As the Supreme Court explained in *Heller I*, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" 554 U.S. at 584. Based on its historical review, the Supreme Court found that the Second Amendment secures an individual right to carry arms in case of confrontation, including the general right to carry a weapon outside the home for self-defense. *Id.* at 584-92. Furthermore, as the court in *Peruta* correctly pointed out, in light of the *Heller I* decision, "the Second Amendment's original meaning is now settled in at least two relevant respects. First, *Heller* [*I*] clarifies that the keeping and bearing of arms is, and has always been, an individual right. Second, the right is, and has always been, oriented to the end of self-defense." 742 F.3d at 1155 (citations omitted).

Nothing in the plain text of the Second Amendment limits the right to bear arms to the home, even if subject to traditional restrictions. Those courts that have recently considered this issue have held that the right to bear arms does encompass the right to carry a gun outside the home. *See id.* at 1167 (concluding that "the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense"); *Woollard*, 712 F.3d at 876 (assuming that the "*Heller* [*I*] right exists outside the home"); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (stating that the "Second Amendment's individual right to bear arms *may* have some application beyond the home"); *Moore*, 702 F.3d at 936–42 (same); *Kachalsky*, 701 F.3d at 89, 96 (basing analysis on the assumption that the Second Amendment "must have *some* application in the very different context of the public possession of firearms").

After *Heller I*, *McDonald*, and the decisions cited above, it is clear that a total ban on the public carrying of ready-to-use handguns outside the home cannot survive a constitutional challenge under any level of scrutiny. "A blanket prohibition on carrying [a] gun in public prevents a person from defending himself anywhere except inside his home," and as such constitutes a "substantial . . . curtailment of the right of armed self-defense." *See Moore*, 702 F.3d at 940; *see also Fla. Carry, Inc. v. Univ. of N. Fla.*, 133 So. 3d 966, 976 (Fla. 1st DCA 2013) (stating that "restricting recreational activities is a far cry from restricting a fundamental, constitutional right to keep and bear arms for self-defense"). As such, we agree with the Ninth Circuit's conclusion that "the Second Amendment

5

secures a right to carry a firearm in some fashion outside the home," and that this right "'could not rationally have been limited to the home.'" *Peruta*, 742 F.3d at 1153 (quoting *Moore*, 702 F.3d at 936).[3]

b. The Nature of the Infringement

Because we have held that carrying a handgun outside the home for self-defense comes within the meaning of "bear[ing] Arms" under the Second Amendment, we must now determine whether section 790.053 infringes on constitutionally protected conduct. *See id.* at 1150 (citing *Chovan*, 735 F.3d 1127, 1136; *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 194; *Greeno*, 679 F.3d at 518; *Ezell*, 651 F.3d at 701-04; *United States v. Chester* (*Chester II*), 628 F.3d 673, 680 (4th Cir. 2010); *Reese*, 627 F.3d at 800-01; and *Marzzarella*, 614 F.3d at 89). A law that "'under the pretence [sic] of regulating, amounts to a destruction of the right,'" *Heller I*, 554 U.S. at 629 (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)), would not pass constitutional muster "[u]nder any of the standards of scrutiny that [the Supreme Court has] applied to enumerated constitutional rights." *Id.* at 628. As the Ninth Circuit stated in *Peruta*, "[p]ut simply, a law that destroys (rather than merely burdens) a right central to the Second Amendment must be struck down." 742 F.3d at 1167; *see also Jackson*, 746 F.3d at 961 ("A law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." (alteration in original) (quoting *Heller I*, 554 U.S. at 629)).

Our analysis in this regard requires us to consult "both text and history" on whether Florida's statute violates the Second Amendment by improperly infringing on the right. *Heller I*, 554 U.S. at 595. While the Court's historical analysis in *Heller I* explained that the Second Amendment conferred a personal right on citizens to keep and bear arms, it made clear that the scope of the Second Amendment is not unlimited. 554 U.S. at 595, 626-27. It is "not a right to keep and carry any weapon

---

[3] We recognize that some cases pre-dating *Heller I* and *McDonald* have held that the carrying of firearms outside the home for self-defense purposes is a privilege. *Crane v. Dep't of State, Div. of Licensing*, 547 So. 2d 266, 267 (Fla. 3d DCA 1989) ("[A] license to carry a concealed weapon or firearm is a privilege and not a vested right."). However, recent cases decided since *Heller I* and *McDonald*, including *Peruta*, have established that the carrying of firearms outside the home for self-defense purposes is more than a mere privilege, and is instead a right protected under both the Second Amendment of the United States Constitution and Article 1, Section 8 of the Florida Constitution, and thus subject to reasonable restrictions.

whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

The implementation of restrictions "does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786; *accord Heller I*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."). The right is subject to "traditional restrictions," which themselves tend "to show the scope of the right." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring); *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196 ("For now, we state that a longstanding, presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment . . . ."); *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). As such, general regulations of activity within the scope of the Second Amendment are constitutional if they are (1) reasonable; and (2) do not effectively destroy the right in practice by imposing a substantial limitation on its exercise.

As a result, some of these "traditional restrictions" were considered presumptively lawful in the eyes of the Court. *See Heller I*, 554 U.S. at 626-27. For example, in addition to "the usual prohibitions of gun ownership by children, felons, illegal aliens, lunatics, and in sensitive places such as public schools, the propriety of which was not questioned in *Heller* [*I*] . . . some states sensibly require that an applicant for a handgun permit establish his competence in handling firearms." *Moore*, 702 F.3d. at 940-41.[4] The Court in *Heller I* also explicitly referenced the history of the concealed carry of weapons, noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. Because the Supreme Court in *Heller I* recognized that concealed-carry restrictions were "presumptively lawful regulatory measures," *id.* at 627 n.26, limitations on open-carry would

---

[4] The Supreme Court in *Heller I* explained:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27. In the footnote accompanying this passage, the Court noted that this was not intended to be an exhaustive list of the limits to the Second Amendment. *Id.* at 627 n.26.

also be presumptively lawful by logical extension so long as limitations on the right to carry outside the home are not so unduly restrictive as to destroy "the *central component*" of the right; namely, the right to self-defense. *Id.* at 599.

### c. Florida Constitution and Statutes

If a restriction or limitation on carrying concealed weapons can pass constitutional review under the Second Amendment, we must also consider whether those restrictions imposed by the Florida Statutes violate Florida's own state constitutional guarantee.

In Florida, the constitutional right of the people to keep and bear arms in defense of themselves dates to the 1838 Florida Constitution. *Fla. Carry, Inc.*, 133 So. 3d at 982-83. Florida's constitutional article is not a mirror image of the federal. Comparing the language found in the Second Amendment with that in the Florida Constitution, it appears that the right of citizens in this state to keep and bear arms was always intended to be an individual right, and never a collective right existing only in the context of militia service. *Compare* Art. I, § 21, Fla. Const. of 1838, (granting the "right to keep and to bear arms, for their common defense."), *with* U.S. Const. Amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."). This court has previously made it clear that "the right of the people to keep and bear arms in defense of themselves" means that each person has the right to keep and bear arms in defense of himself, individually. *See Alexander v. State*, 450 So. 2d 1212, 1214 (Fla. 4th DCA 1984).

The Florida Legislature's authority to regulate the manner in which citizens can exercise their right to bear arms derives as much from the Florida Constitution as it does from the Second Amendment. On this point, the Florida Constitution states:

> The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the state shall not be infringed, *except that the manner of bearing arms may be regulated by law.*

Art. I, § 8(a), Fla. Const. (emphasis added). A key difference between the state and federal provisions is that the Florida Constitution, unlike the U.S. Constitution, explicitly states that the manner in which guns are borne can be regulated. *See Rinzler v. Carson*, 262 So. 2d 661, 665 (Fla. 1972) (stating that "althogh [sic] the Legislature may not entirely prohibit

the right of the people to keep and bear arms, it can determine that certain arms or weapons may not be kept or borne by the citizen. We have specifically held that the Legislature can regulate the use and the manner of bearing certain specific weapons."). In fact, no controlling authority has been presented to this court for the proposition that the Legislature may not impose some restrictions and conditions on either the method or manner that lawful arms may be carried outside the home. In fact, the plain wording of the Florida Constitution provides explicit support for the State's position that it may regulate the open carry of firearms.

In enacting section 790.25(1), Florida Statutes, the Legislature enunciated a "Declaration of Policy" with regard to the "Lawful ownership, possession, and use of firearms and other weapons:"

> The Legislature finds as a matter of public policy and fact that it is necessary to promote firearms safety and to curb and prevent the use of firearms and other weapons in crime and by incompetent persons without prohibiting the lawful use in defense of life, home, and property, and the use by United States or state military organizations, and as otherwise now authorized by law, including the right to use and own firearms for target practice and marksmanship on target practice ranges or other lawful places, and lawful hunting and other lawful purposes.

§ 790.25(1), Fla. Stat. (2012). Section 790.25(4) addresses the construction to be given chapter 790, and provides in part as follows:

> This act shall be liberally construed to carry out the declaration of policy herein and in favor of the constitutional right to keep and bear arms for lawful purposes. This act is supplemental and additional to existing rights to bear arms now guaranteed by law and decisions of the courts of Florida, and nothing herein shall impair or diminish any of such rights.

§ 790.25(4), Fla. Stat. (2012).

As part of chapter 790, the Florida legislature also enacted the statute in question, section 790.053. This statute prohibits the open carrying of loaded or unloaded handguns in most public areas except under limited circumstances. Under section 790.053, entitled "Open carrying of weapons," the statute provides:

(1) Except as otherwise provided by law and in subsection (2), it is unlawful for any person to openly carry on or about his or her person any firearm or electric weapon or device. It is not a violation of this section for a person licensed to carry a concealed firearm as provided in s. 790.06(1), and who is lawfully carrying a firearm in a concealed manner, to briefly and openly display the firearm to the ordinary sight of another person, unless the firearm is intentionally displayed in an angry or threatening manner, not in necessary self-defense.

(2) A person may openly carry, for purposes of lawful self-defense:

(a) A self-defense chemical spray.

(b) A nonlethal stun gun or dart-firing stun gun or other nonlethal electric weapon or device that is designed solely for defensive purposes.

(3) Any person violating this section commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

§ 790.053, Fla. Stat. (2012).

Additionally, section 790.25(3), Florida Statutes, limits the application of section 790.053 as follows:

LAWFUL USES.—The provisions of ss. 790.053 and 790.06 do not apply in the following instances, and, despite such sections, it is lawful for the following persons to own, possess, and lawfully use firearms and other weapons, ammunition, and supplies for lawful purposes:

(a) Members of the Militia, National Guard, Florida State Defense Force, Army, Navy, Air Force, Marine Corps, Coast Guard, organized reserves, and other armed forces of the state and of the United States, when on duty, when training or preparing themselves for military duty, or while subject to recall or mobilization;

(b) Citizens of this state subject to duty in the Armed Forces under s. 2, Art. X of the State Constitution, under chapters 250 and 251, and under federal laws, when on duty or when training or preparing themselves for military duty;

(c) Persons carrying out or training for emergency management duties under chapter 252;

(d) Sheriffs, marshals, prison or jail wardens, police officers, Florida highway patrol officers, game wardens, revenue officers, forest officials, special officers appointed

10

under the provisions of chapter 354, and other peace and law enforcement officers and their deputies and assistants and full-time paid peace officers of other states and of the Federal Government who are carrying out official duties while in this state;

(e) Officers or employees of the state or United States duly authorized to carry a concealed weapon;

(f) Guards or messengers of common carriers, express companies, armored car carriers, mail carriers, banks, and other financial institutions, while actually employed in and about the shipment, transportation, or delivery of any money, treasure, bullion, bonds, or other thing of value within this state;

(g) Regularly enrolled members of any organization duly authorized to purchase or receive weapons from the United States or from this state, or regularly enrolled members of clubs organized for target, skeet, or trap shooting, while at or going to or from shooting practice; or regularly enrolled members of clubs organized for modern or antique firearms collecting, while such members are at or going to or from their collectors' gun shows, conventions, or exhibits;

(h) A person engaged in fishing, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition;

(i) A person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person while engaged in the lawful course of such business;

(j) A person firing weapons for testing or target practice under safe conditions and in a safe place not prohibited by law or going to or from such place;

(k) A person firing weapons in a safe and secure indoor range for testing and target practice;

(l) A person traveling by private conveyance when the weapon is securely encased or in a public conveyance when the weapon is securely encased and not in the person's manual possession;

(m) A person while carrying a pistol unloaded and in a secure wrapper, concealed or otherwise, from the place of purchase to his or her home or place of business or to a place of repair or back to his or her home or place of business;

(n) A person possessing arms at his or her home or place of business;

(o) Investigators employed by the several public defenders of the state, while actually carrying out official duties, provided such investigators:

1. Are employed full time;

2. Meet the official training standards for firearms established by the Criminal Justice Standards and Training Commission as provided in s. 943.12(5) and the requirements of ss. 493.6108(1)(a) and 943.13(1)-(4); and

3. Are individually designated by an affidavit of consent signed by the employing public defender and filed with the clerk of the circuit court in the county in which the employing public defender resides.

(p) Investigators employed by the capital collateral regional counsel, while actually carrying out official duties, provided such investigators:

1. Are employed full time;

2. Meet the official training standards for firearms as established by the Criminal Justice Standards and Training Commission as provided in s. 943.12(1) and the requirements of ss. 493.6108(1)(a) and 943.13(1)-(4); and

3. Are individually designated by an affidavit of consent signed by the capital collateral regional counsel and filed with the clerk of the circuit court in the county in which the investigator is headquartered.

§ 790.25(3), Fla. Stat. (2012). It is also a crime to carry a concealed firearm without a license. § 790.01(2)-(3), Fla. Stat. (2012). Under chapter 790, there is no permit available for deliberate open carry, making it illegal in virtually all circumstances. *See* § 790.25(3).

In accord with the authority granted by the state constitution, Florida adopted its "shall-issue," permit-based concealed carry provisions in 1987, now codified in section 790.06(2), Florida Statutes (2012). This provision provides that the Department of Agriculture and Consumer Services is *required* to issue a license when the applicant meets the following nondiscretionary, objective criteria for issuance:

(2) The Department of Agriculture and Consumer Services shall issue a license if the applicant:

(a) Is a resident of the United States and a citizen of the United States or a permanent resident alien of the United States, as determined by the United States Bureau of Citizenship and Immigration Services, or is a consular security official of a foreign government that maintains

diplomatic relations and treaties of commerce, friendship, and navigation with the United States and is certified as such by the foreign government and by the appropriate embassy in this country;

(b)   Is 21 years of age or older;

(c)   Does not suffer from a physical infirmity which prevents the safe handling of a weapon or firearm;

(d)   Is not ineligible to possess a firearm pursuant to s. 790.23 by virtue of having been convicted of a felony;

(e)   Has not been committed for the abuse of a controlled substance or been found guilty of a crime under the provisions of chapter 893 or similar laws of any other state relating to controlled substances within a 3-year period immediately preceding the date on which the application is submitted;

(f)   Does not chronically and habitually use alcoholic beverages or other substances to the extent that his or her normal faculties are impaired. It shall be presumed that an applicant chronically and habitually uses alcoholic beverages or other substances to the extent that his or her normal faculties are impaired if the applicant has been committed under chapter 397 or under the provisions of former chapter 396 or has been convicted under s. 790.151 or has been deemed a habitual offender under s. 856.011(3), or has had two or more convictions under s. 316.193 or similar laws of any other state, within the 3-year period immediately preceding the date on which the application is submitted;

(g)   Desires a legal means to carry a concealed weapon or firearm for lawful self-defense;

(h)   Demonstrates competence with a firearm by any one of the following:

1.   Completion of any hunter education or hunter safety course approved by the Fish and Wildlife Conservation Commission or a similar agency of another state;

2.   Completion of any National Rifle Association firearms safety or training course;

3.   Completion of any firearms safety or training course or class available to the general public offered by a law enforcement, junior college, college, or private or public institution or organization or firearms training school, utilizing instructors certified by the National Rifle Association, Criminal Justice Standards and Training Commission, or the Department of Agriculture and Consumer Services;

4.   Completion of any law enforcement firearms safety or training course or class offered for security guards,

investigators, special deputies, or any division or subdivision of law enforcement or security enforcement;

5. Presents evidence of equivalent experience with a firearm through participation in organized shooting competition or military service;

6. Is licensed or has been licensed to carry a firearm in this state or a county or municipality of this state, unless such license has been revoked for cause; or

7. Completion of any firearms training or safety course or class conducted by a state-certified or National Rifle Association certified firearms instructor;

A photocopy of a certificate of completion of any of the courses or classes; or an affidavit from the instructor, school, club, organization, or group that conducted or taught said course or class attesting to the completion of the course or class by the applicant; or a copy of any document which shows completion of the course or class or evidences participation in firearms competition shall constitute evidence of qualification under this paragraph; any person who conducts a course pursuant to subparagraph 2., subparagraph 3., or subparagraph 7., or who, as an instructor, attests to the completion of such courses, must maintain records certifying that he or she observed the student safely handle and discharge the firearm;

(i) Has not been adjudicated an incapacitated person under s. 744.331, or similar laws of any other state, unless 5 years have elapsed since the applicant's restoration to capacity by court order;

(j) Has not been committed to a mental institution under chapter 394, or similar laws of any other state, unless the applicant produces a certificate from a licensed psychiatrist that he or she has not suffered from disability for at least 5 years prior to the date of submission of the application;

(k) Has not had adjudication of guilt withheld or imposition of sentence suspended on any felony or misdemeanor crime of domestic violence unless 3 years have elapsed since probation or any other conditions set by the court have been fulfilled, or the record has been sealed or expunged;

(l) Has not been issued an injunction that is currently in force and effect and that restrains the applicant from committing acts of domestic violence or acts of repeat violence; and

(m) Is not prohibited from purchasing or possessing a firearm by any other provision of Florida or federal law.

§ 790.06(2), Fla. Stat. (2012). As a "shall-issue" state, the issuance of the concealed weapons permit is not subject to any proof of need other than a statement by the applicant that they "[d]esire[] a legal means to carry a concealed weapon or firearm for lawful self-defense." *Id.* § 790.06(2)(g). The Department of Agriculture has no discretion, and may not withhold a permit from an individual based on any subjective beliefs, provided these statutory elements are met by the applicant.

d. Comparing the Right to Bear Arms in Florida with Other States

Florida's requirements to obtain a permit for concealed carry are not so burdensome, or so onerous, as to make the ability to obtain a permit illusory. Nor can it be said that these requirements, unlike those found in other jurisdictions, make the right to carry a weapon in public a virtual nullity.[5] For example, California's statutory requirements to obtain a permit included the proviso that the issuing authority could impose any "reasonable restrictions or conditions" that the issuing authority deemed warranted, Cal. Penal Code § 26200(a) (West 2012), as well as proof that good cause exists for the issuance of the permit. Cal. Penal Code § 26155(a) (West 2012) (proscribing the issuance of a license if it is determined that "the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm"). This type of "good cause" permitting requirement, making the ability to lawfully carry a weapon for self-defense outside the home subject to the caprice or whim of the issuing agent, was recently found to impermissibly infringe on the Second Amendment. *Peruta,* 742 F.3d at 1179 ("San Diego County's 'good cause' permitting requirement impermissibly infringes on the Second Amendment right to bear arms in lawful self-defense.").

Florida's licensing statute does not effectively act as an exclusionary bar to the right to bear arms in lawful self-defense outside the home. A comparison with California and New York illustrates this point. Under the California licensing regulations as of September 2011, there were only

---

[5] *See, e.g.*, N.Y. Penal Law § 400.00(1) (McKinney 2014) (providing a long list of requirements for determining an applicant's eligibility to be issued or to renew a firearms license).

35,000 authorized permit holders[6] in a population of more than 37 million residents.[7]  In New York City, as of December 2010, there were 5,700 permits issued[8] for a population of approximately 8 million.[9]  In contrast, over two decades from 1987 to 2014, Florida issued concealed weapons permits to more than 2.7 million people.[10]  As of December 2014 there were 1,535,030 active permits issued[11] in a population of over 19 million.[12]  No empirical evidence suggests in any way that Florida concealed carry permits are unduly restricted to only a few people, such that a citizen's right to lawfully carry a firearm is illusory.

Thus, we conclude that Florida's ban on open carry, while permitting concealed carry, does not improperly infringe on Florida's constitutional guarantee, nor does it infringe on "the *central component*" of the Second Amendment—the right of self-defense.  *Heller I*, 554 U.S. at 599.

e.  Constitutionality of Section 790.053

In light of Florida's "shall-issue" permitting scheme and the relative ease in which a law-abiding citizen may obtain a license to carry a firearm outside the home, we now turn our attention to what level of scrutiny should be applied to the statute.

---

[6] Crime Prevention Research Ctr., Concealed Carry Permit Holders Across the United States 10 (2014) *available at* http://crimepreventionresearchcenter.org/ wp-content/uploads/2014/07/Concealed-Carry-Permit-Holders-Across-the-United-States.pdf.

[7] http://www.infoplease.com/ipa/A0004986.html (last visited Jan. 5, 2015).

[8] Crime Prevention Research Ctr., *supra* note 6.

[9] Dep't of City Planning City of New York, http://www.nyc.gov/ html/dcp/html/census/popcur.shtml (last visited Dec. 18, 2014).

[10] http://www.freshfromflorida.com/content/download/7499/118851/ cw_monthly.pdf (last visited Jan. 4, 2015).

[11] http://www.freshfromflorida.com/content/download/7471/118627/Number _of_Licensees_By_Type.pdf (last visited Jan. 4, 2015).

[12] U.S. Census Bureau, https://www.census.gov/newsroom/press-releases/ 2014/cb14-232.html (last visited Jan. 6, 2014).

### 1. Applying Intermediate Scrutiny or Strict Scrutiny

After determining that the statute does not destroy the core right of self-defense enshrined in the Second Amendment and Florida's constitutional guarantee, we are guided in our analysis by the holding in *Heller I* establishing that Second Amendment challenges are no longer susceptible to a rational-basis review. 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Therefore, we must decide whether to apply either intermediate scrutiny or strict scrutiny to the statute being challenged in this case.

Intermediate scrutiny "'require[s] (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.'" *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139); *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988) (a challenged law "must be substantially related to an important governmental objective."); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (stating that "a regulation that burdens a plaintiff's Second Amendment rights 'passes constitutional muster [under an intermediate scrutiny standard] if it is substantially related to the achievement of an important governmental interest'" (quoting *Kachalsky*, 701 F.3d at 96)). In contrast, strict scrutiny "requires the Government to prove that [a challenged law] 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007)).

The Supreme Court has indicated that there is a presumption in favor of utilizing strict scrutiny whenever a fundamental right is involved. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (discussing fundamental liberties and stating that strict scrutiny applies to "rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977))). However, as previously explained, section 790.053 does not improperly infringe on the Second Amendment's core right of self-defense.[13] As such, strict scrutiny is not necessarily the applicable test to

---

[13] Since in *McDonald* the Court held that the Second Amendment is applied to the states through the Fourteenth Amendment, 561 U.S. at 791, we note that rights incorporated through the Fourteenth amendment have also been subjected to tiered scrutiny by some courts. *See, e.g.*, *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

be used here.  *See* Richard H. Fallon, *Some Confusions About Due Process, Judicial Review & Constitutional Remedies,* 93 Colum. L. Rev. 309, 315 (1993) (stating that "[n]ot every restriction of a right classified as fundamental incurs 'strict' scrutiny"); *see also Bleiler v. Chief, Dover Police Dep't,* 927 A.2d 1216, 1221 (2007).  "Historically, intermediate scrutiny has been applied to content-neutral restrictions that place an incidental burden on" a constitutional right.  *Shew v. Malloy,* 994 F. Supp. 2d 234, 246 (D. Conn. 2014) (citing *United States v. Virginia,* 518 U.S. 515, 568, (1996)).

Laws that regulate only the "manner in which persons may lawfully exercise their Second Amendment rights," *Marzzarella,* 614 F.3d at 97, have been held to be less burdensome than those which bar firearm possession completely.  *See United States v. Decastro,* 682 F.3d 160, 166 (2d Cir. 2012); *see also Heller II,* 670 F.3d at 1257; *Masciandaro,* 638 F.3d at 470.  Similarly, "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not."  *Jackson,* 746 F.3d at 961 (citing *Marzzarella,* 614 F.3d at 97).

While undertaking this analysis, we note that most of the federal circuits to reach step two of the two-step test followed here have applied intermediate scrutiny when considering challenges to laws which impact the Second Amendment right.  *See Jackson,* 746 F.3d at 965, 968 (holding that intermediate scrutiny was the appropriate standard to apply to laws which "implicate[] the core . . . Second Amendment right [of self-defense] . . . [but do not] impose a substantial burden on conduct protected by the Second Amendment," and to those that "neither regulate[] conduct at the core . . . nor burden[] that right severely"); *see also Chovan,* 735 F.3d 1127, 1138 (9th Cir. 2013) (holding that a federal law placing a lifetime ban on the possession of firearms on those convicted of domestic violence misdemeanors was subject to intermediate scrutiny); *Woollard,* 712 F.3d at 876 (determining intermediate scrutiny to be the applicable standard to apply to a Maryland law requiring handgun permits); *Nat'l Rifle Ass'n of Am.,* 700 F.3d at 205 (concluding that a federal law "prohibit[ing] commercial handgun sales to 18-to-20-year-olds" triggered "nothing more than 'intermediate' scrutiny"); *Heller II,* 670 F.3d at 1257 (concluding that intermediate scrutiny is the "more appropriate standard for review of gun registration laws"); *Reese,* 627 F.3d at 802 (holding that a statute prohibiting possession of a firearm while under a domestic protection order is subject to intermediate scrutiny); *Marzzarella,* 614 F.3d at 97 (applying intermediate scrutiny to a statute prohibiting possession of firearms with the serial number obliterated, but acknowledging that the matter was "not free from doubt").  *But see Tyler,* 2014 WL 7181334, at

*17 (applying strict scrutiny and stating that "[i]n choosing strict scrutiny, we join a significant, increasingly emergent though, as yet, minority view that concludes that as between intermediate scrutiny and strict scrutiny . . . the latter is more appropriate for assessing a challenge to an enumerated constitutional right"); *Peruta*, 742 F.3d at 1167-79 (declining to undertake a heightened scrutiny analysis because the court determined that the provision at issue destroyed the "Second Amendment right to bear arms in lawful self-defense").

At least one federal circuit court applying the two-step analysis has employed a seemingly more demanding form of intermediate scrutiny to Second Amendment challenges. *See Ezell*, 651 F.3d at 708-09 (contrasting the intermediate scrutiny previously applied by the Seventh Circuit in *Skoien* to the prohibition against firearm possession by "persons convicted of a domestic violence misdemeanor," with the intermediate scrutiny applied in *Ezell* to a law affecting possession of a firearm by law-abiding citizens on a firing range, and stating that "this suggests that a more rigorous showing than that applied in *Skoien* should be required, if not quite 'strict scrutiny'"). Another decided the issue at step one of the two-step analysis. *See Greeno*, 679 F.3d at 520 (finding that the provision at issue fell "outside the scope of the Second Amendment right as historically understood" and thus failing to reach the issue of which form of heightened scrutiny should be applied).

Still other federal circuit courts have concluded that intermediate scrutiny is the appropriate standard to apply to Second Amendment challenges, but declined to employ the two-step analysis. *See Kachalsky*, 701 F.3d at 96-97 (concluding that "intermediate scrutiny is [the] appropriate" standard to apply to a New York handgun licensing law requiring a showing of "proper cause" to carry a concealed handgun); *Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (holding that "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective"); *Masciandaro*, 638 F.3d at 470-71 (stating that "[w]hile we find [that] the application of strict scrutiny [is] important to protect the core right of the self-defense of a law-abiding citizen in his home . . . we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home. Accordingly, [the challenged provision] will survive . . . if it satisfies intermediate scrutiny"); *Skoien*, 614 F.3d at 641-42 (accepting the government's concession that intermediate scrutiny is the appropriate standard).

19

Finally, some federal circuit courts have declined to decide such challenges based on a standard of heightened scrutiny. *See Moore*, 702 F.3d 933, 941 (stating that "our analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states"); *White*, 593 F.3d at 1205–06 (holding a federal law prohibiting those found guilty of misdemeanor domestic violence from possessing firearms to be "a presumptively lawful 'longstanding prohibition[] on the possession of firearms'" as described by the Supreme Court in *Heller I* (alteration in original) (quoting *Heller I*, 554 U.S. at 626))); *Rene E.*, 583 F.3d at 16 (holding that the Second Amendment was not violated by a law prohibiting juveniles from possessing handguns after "evaluat[ing] this prohibition in light of the state laws of the nineteenth century regulating juvenile access to handguns on the ground that their possession can pose a serious threat to public safety . . . [and] evaluat[ing] evidence that the founding generation would have regarded as consistent with the right to keep and bear arms").

These cases illustrate that the level of scrutiny to be applied to Second Amendment questions, or, indeed, whether a standard of heightened scrutiny should be applied at all, is unsettled. *Chester*, 628 F.3d at 688-89 (Davis, J., concurring) ("*Heller* [*I*] has left in its wake a morass of conflicting lower court opinions regarding the proper analysis to apply to challenged firearms regulations."). While Second Amendment jurisprudence is still in its infancy and the scope of the Second Amendment is not yet clearly defined, *see Marzzarella*, 614 F.3d at 101, we believe, and the weight of authority from various jurisdictions leads us to conclude, that intermediate scrutiny is the proper standard to apply to section 790.053.

Regarding the first prong of the intermediate scrutiny test, the State asserts that public safety is the paramount interest furthered by the ban on open carry. We agree that such an interest is compelling. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted." (quoting *De Veau v. Braisted*, 363 U.S. 144, 155 (1960))); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1470 (2009) ("[V]irtually every gun control law is aimed at serving interests that would usually be seen as compelling—preventing violent crime, injury, and death."). Because we agree that the government has a substantial interest in regulating firearms as a matter of public safety, *Shew*, 994 F. Supp. 2d at 248-49 (stating that "'[t]he regulation of firearms is a paramount issue of public safety'" (quoting *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013)), the first prong of the test is easily satisfied.

As to the second prong, because of the difficulty in obtaining empirical proof of regulation efficacy, courts have traditionally been more deferential to the legislature in this area. *Heller v. Dist. of Columbia* (*Heller III*), No. 08-1289, 2014 WL 1978073, at *10 (D.D.C. May 15, 2014) ("'The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.'" (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000))). *But see Peruta*, 742 F.3d at 1176-77 (stating that "when assessing 'the fit between the asserted interests and the means chosen to advance them,'" a court should apply "no such deference" (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997))).[14] Our review of the Declaration of Policy expressed in section 790.25 sufficiently establishes that a reasonable fit exists between the challenged law and the Legislature's asserted objectives. As a result, this second prong of the intermediate scrutiny analysis is satisfied as well.

Therefore, we hold that section 790.25 passes the intermediate scrutiny test and survives Defendant's challenge.

### 2. Overbreadth

Defendant also asks this court to declare that Florida's "open carry" prohibition is overbroad and should be found to be unconstitutional because it infringes on constitutionally protected conduct.

It has been noted that First Amendment standards of review are generally ill-suited for use in settling Second Amendment questions.[15]

---

[14] Reliable scientific proof regarding the efficacy of prohibiting open carry is difficult to obtain. Volokh, 56 UCLA L. Rev. at 1465 ("There are no controlled experiments that can practically and ethically be run. 'Natural experiments' stemming from differences in policies and in gun ownership rates among different cities, states, or countries are subject to many confounding factors, such as culture and background crime rates.").

[15] *See, e.g.*, Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 Yale L.J. 852, 895-96 (2013) (discussing the problems of using First Amendment standards of scrutiny to Second Amendment challenges, and stating that "[t]he flexible levels-of-scrutiny analysis that encumbers the First Amendment is 'baggage' the *Heller* [*I*] majority seems eager to shed when it comes to the Second Amendment") (footnotes omitted); Lawrence Rosenthal, *Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Law. 1, 82 (2009) ("Seeking guidance from the standards of

Moreover, recent cases in other courts following *Heller I* and *McDonald* have similarly declined to consider applying an overbreadth analysis, as used in First Amendment cases, to challenges of firearms laws. *United States v. Chester (Chester III)*, 514 F. App'x 393, 395 (4th Cir. 2013) ("[N]o circuit has accepted an overbreadth challenge in the Second Amendment context."); *Kachalsky*, 701 F.3d at 101 (refusing to consider Second Amendment overbreadth challenge because "[o]verbreadth challenges are generally limited to the First Amendment context," and "even if . . . overbreadth analysis may apply to Second Amendment cases," it may be invoked only by plaintiffs with a valid as-applied challenge); *Decastro*, 682 F.3d at 169 ("There is no overbreadth argument that [appellant] can make in the Second Amendment context."); *United States v. Barton*, 633 F.3d 168, 172 n.3 (3d Cir. 2011) (noting, in Second Amendment challenges, that courts "do not recognize an 'overbreadth' doctrine outside the limited context of the First Amendment").[16]

---

scrutiny under the First Amendment, although advocated by some, encounters serious problems.") (footnote omitted).

[16] Justice Scalia invoked the First Amendment numerous times to declare an individual right to keep and bear arms in *Heller I*. *See* 554 U.S. at 579–80, 582, 591, 595, 629 n.27, 635 (appealing to free speech or the First Amendment to support various interpretive points). Therefore, we do not imply that challenges in Second Amendment cases can never be resolved by looking to other areas of First Amendment jurisprudence, or that such jurisprudence cannot be applied to Second Amendment challenges in other contexts. For example, content neutral regulations limiting speech's time, place, or manner must also survive a form of intermediate scrutiny similar to that undertaken here—i.e., if the regulation promotes a significant interest unrelated to the suppression of a message and allows for "'ample alternative channels for communication.'" *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Similar regulations have also been subjected to a form of intermediate scrutiny because doing so imposes a lesser burden on First Amendment values. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (stating that "[i]n places which by long tradition or by government fiat have been devoted to assembly and debate . . . [t]he state may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication") (citations omitted). Indeed, the Third Circuit's decision in *Marzzarella* rested on a view that because "*Heller [I]* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment," that fact "implies the structure of First Amendment doctrine should inform . . . analysis of the Second Amendment." 614 F.3d at 89 n.4. *But see Kachalsky*, 701 F.3d at 91-92 (stating that "[w]e are hesitant to import **substantive** First Amendment principles wholesale into Second Amendment jurisprudence. . . . it

22

The Sixth Circuit is the only court we have found to engage in an overbreadth analysis in the context a Second Amendment challenge, and it did so after determining, at step two of the two-step test, that strict scrutiny should apply to the provision at issue in that case. *See Tyler*, 2014 WL 7181334, at \*19 (stating that "[o]verbreadth, however, can and must be considered as *part of* strict scrutiny's narrow-tailoring requirement"). Therefore, because we have determined that applying strict scrutiny is not appropriate here, we decline the invitation to consider Defendant's challenge to Florida's open carry restriction using an overbreadth analysis.

### 3. Alternative Channels to Exercise the Right

Defendant does not argue that the requirements to obtain a Florida permit are unreasonable to the point of making the law unconstitutional. Defendant was not prohibited from obtaining a concealed weapons permit—indeed, he possessed one at the time of his arrest. Likewise, Defendant did not argue that he was somehow precluded from the ability to lawfully carry his weapon in a concealed fashion. He was able to lawfully possess his firearm, albeit while concealed, for self-defense purposes as recognized by the Second Amendment, the Florida Constitution, and Florida Statutes. The course of conduct he chose, that of openly carrying his firearm for protection, was not the only option available to him to exercise his rights.

While the right to carry outside the home has been established by the highest court of the land, no decision interpreting the Second Amendment can be cited for the proposition that a state must allow for one form of carry over another.[17] Because the Legislature has the right to enact laws regarding the manner in which arms can be borne, it is likewise permitted to forbid the carrying of arms in a particular place or manner which, in its

would be as imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First.").

Also, in the First Amendment context, the Court has applied strict scrutiny when reviewing situations where there has been an "infringement" on political speech, *Citizens United*, 558 U.S. at 340, and on the freedom of association, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000), and on a content-based speech regulation. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

[17] In *Heller I*, the Court cites several nineteenth-century cases holding that certain modes of public carry can be prohibited when other modes are allowed. 554 U.S. at 610-14.

collective judgment, is likely to lead to breaches of the peace, *see Carlton v. State*, 58 So. 486, 488-89 (Fla. 1912), provided a reasonable alternative manner of carry is provided.

We stress, however, that the Legislature's discretion in this area is not limitless. For example, the federal court in *Kachalsky* upheld New York's prohibitive licensing scheme using an intermediate scrutiny analysis that gave too much deference to the legislature, without considering the fact that the licensing scheme in question rendered the right to bear arms outside the home virtually non-existent. *See Kachalsky*, 701 F.3d at 97 (stating that "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks. Thus, our role is only 'to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence.'" (alteration in original) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665-66 (1994))). A right is essentially "destroyed [if the] exercise of [that] right is limited to a few people, in a few places, at a few times." *Peruta*, 742 F.3d at 1170. The degree of legislative deference exhibited in cases such as *Woollard*, *Drake* and *Kachalsky* goes too far, and would serve to validate expansive restrictions inconsistent with those rights guaranteed by the Second Amendment and the Florida Constitution.

The Legislature "has a right to prescribe a particular manner of carry, provided that it does not 'cut[ ] off the exercise of the right of the citizen altogether to *bear arms*, or, under the color of prescribing the *mode*, render[ ] the right itself useless.'" *Id.* at 1172 (quoting *Nunn v. State*, 1 Ga. 243, 248 (1846). The Legislature is permitted to regulate the manner in which arms are borne for the purpose of maintaining public peace and safety, so long as any such regulation leaves available a viable carry mode.

Therefore, under *Heller I*, the Florida Legislature could properly choose to regulate either the open or concealed carrying of firearms, or choose to regulate neither open nor concealed carry. What is clear is that the state cannot enact legislation that effectively prohibits both open and concealed carry at the same time. Any complete prohibition on public carry would "violate[] the Second Amendment and analogous state constitutional provisions." *Drake*, 724 F.3d at 449 (Hardiman, J., dissenting).

In our opinion, section 790.053 does not effectively enjoin responsible, law-abiding citizens from the right to carry a firearm in public for self-defense. Rather, it permits the typical responsible, law-abiding citizen the ability to bear arms in public, albeit with constitutionally permissible

restrictions, for the lawful purpose of self-defense. Florida's licensing scheme is not unduly restrictive, and is consistent with the valid use of its police powers and the dictates of the Constitution to promote safety for both the firearm carrier and the community at large. Further, open carry is not the only practical avenue by which Defendant may lawfully carry a gun in public for self-defense. Through its "shall-issue" permitting scheme, Florida has provided a viable alternative outlet to open firearms carry which gives practical effect to its citizens' exercise of their Second Amendment rights.

II. The Exceptions to the Prohibition Against Open Carry Constitute Affirmative Defenses.

Defendant asserts that the exceptions under section 790.25(3) are elements the State must prove to support a violation of the open carry statute, not affirmative defenses. The State responds that the exceptions are affirmative defenses that must initially be raised by, and supported with, evidence from the defendant, rather than negated in the first instance by the state. "Determining whether [an] exception is an element of the crime to be negated by the State or is in the nature of a defense, requiring the defendant to come forward with evidence, is an issue of law subject to de novo review." *Hodge v. State*, 866 So. 2d 1270, 1271-72 (Fla. 4th DCA 2004).

In determining whether an exception is an element of the crime or an affirmative defense, a court looks to its placement in the wording of the statute. *Id.* at 1272. As we explained *in Hodge*:

> If the exception appears in the enacting clause, the burden lies with the State to prove that the defendant is not within the exception; but, if the exception is contained in a subsequent clause or statute, that is a matter of defense requiring the defendant to put forth some evidence in support thereof.

*Id.*

In the instant case, the exceptions are not in the enacting clause of section 790.053, but are contained within a separate statute altogether. *See* § 790.25(3). The trial court properly read section 790.053 in conjunction with section 790.25(3), which sets forth specific persons, places, and activities where it is legal to "own, possess, and lawfully use" (and in some cases openly display), firearms without first obtaining any permit or license. *Id.*

25

Since the law specifically excludes prosecution for open carry violations in those instances, the trial court correctly determined they are affirmative defenses and instructed the jury as to the elements of the crime.

### III. Defendant Does not have Standing to Challenge the "Brief and Open Display" Exception.

Defendant further argues that the open carry statute is unconstitutionally vague as to what constitutes a "brief" and open display of a firearm. Section 790.053 contains the following exception:

> It is not a violation of this section for a person licensed to carry a concealed firearm as provided in s. 790.06(1), and who is lawfully carrying a firearm in a concealed manner, to briefly and openly display the firearm to the ordinary sight of another person, unless the firearm is intentionally displayed in an angry or threatening manner, not in necessary self-defense.

Testimony during trial revealed that in February 2012, officers from the Fort Pierce Police Department responded to a call. When the officers arrived at the scene five minutes later, they saw Defendant carrying a firearm in "plain view" in a holster on his hip. The firearm was on the outside of Defendant's tight fitting tank top. A video recording from a police car was introduced into evidence and published to the jury. The video depicts Defendant walking on the sidewalk with the firearm clearly visible on the outside of his clothing. After the trial, the court denied Defendant's various motions to dismiss, making a finding of fact that there was no credible evidence presented at trial that Defendant's firearm had been concealed before his arrest, or that it could have been, considering his manner of dress.

Defendant is precluded from bringing an "as applied" constitutional challenge because the factual findings made by the trial court demonstrate that he never concealed his weapon during the relevant period. Despite Defendant's claim that his weapon was holstered and thus legally "concealed," a holster alone cannot conceal a firearm. "Conceal" means "to hide (something or someone) from sight" or "to keep (something) secret."[18] Defendant's holstered weapon was in plain view. Because he openly displayed his firearm at all times, the exception he seeks to challenge does not apply to him, and therefore, he lacks standing to raise

---

[18] *Conceal Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/concealed?show=0&t=1396289892 (last visited Jan. 4, 2015).

this challenge.    *See Broadrick*, 413 U.S. at 610 ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

Accordingly, we uphold the trial court's findings in all respects.

*Affirmed.*

MAY and CIKLIN, JJ., concur.

*    *    *

**_Not final until disposition of timely filed motion for rehearing._**