# Supreme Court of Florida

_____

No. SC15-650
_____

**DALE LEE NORMAN,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[March 2, 2017]

PARIENTE, J.

In this case, we determine the constitutionality of section 790.053, Florida

Statutes (2012) ("Florida's Open Carry Law"), first passed by the Legislature in

1987 and challenged by Norman as a violation of his right to bear arms for self-

defense outside the home under both the United States and Florida Constitutions.

The Fourth District Court of Appeal concluded that Florida's Open Carry Law

does not violate the Second Amendment to the United States Constitution or article

I, section 8, of the Florida Constitution. Norman v. State, 159 So. 3d 205 (Fla. 4th

DCA 2015). We accepted jurisdiction on the basis that the Fourth District

expressly construed the United States and Florida Constitutions and expressly declared valid a state statute. See art. V, § 3(b)(3), Fla. Const.

Florida's Open Carry Law is a provision within Florida's overall scheme regulating the use of firearms (codified in chapter 790, Florida Statutes), but still allowing the possession of firearms in most instances. See § 790.06, Fla. Stat. (2012). Chapter 790 permits individuals to carry firearms in public, so long as the firearm is carried in a concealed manner. Pursuant to section 790.06, Florida employs a "shall issue" scheme for issuing licenses to carry concealed firearms in public. See id. Under this licensing scheme, which leaves no discretion to the licensing authority, the licensing authority must issue an applicant a concealed carry license, provided the applicant meets objective, statutory criteria. Id. Accordingly, as the Fourth District observed in explaining the breadth of Florida's "shall issue" licensing scheme, the right of Floridians to bear arms for self-defense outside of the home is not illusory:

> Florida's licensing statute does not effectively act as an exclusionary bar to the right to bear arms in lawful self-defense outside the home. . . . [In] over two decades from 1987 to 2014, Florida issued concealed weapons permits to more than 2.7 million people. As of December 2014 there were 1,535,030 active permits issued in a population of over 19 million. No empirical evidence suggests in any way that Florida concealed carry permits are unduly restricted to only a few people, such that a citizen's right to lawfully carry a firearm is illusory.

Norman, 159 So. 3d at 219 (footnotes omitted).[1]  Further, pursuant to chapter 790,

Florida law provides sixteen exceptions to Florida's Open Carry Law, including a

broad exception that applies to persons "engaged in fishing, camping, or lawful

hunting or going to or returning from a fishing, camping, or lawful hunting

expedition."  § 790.25(3)(h), Fla. Stat. (2012) (emphasis added); see also §

790.25(3), Fla. Stat. (2012) (providing a list of sixteen statutory exceptions to the

Open Carry Law).  Because of the comprehensive nature of Florida's regulatory

scheme of firearms, we review the constitutionality of Florida's Open Carry Law

within the context of chapter 790.

    As we explain more fully below, we agree with the Fourth District that the

State has an important interest in regulating firearms as a matter of public safety,

and that Florida's Open Carry Law is substantially related to this interest.  Norman,

159 So. 3d at 222-23.  We conclude that Florida's Open Carry Law violates neither

the Second Amendment to the United States Constitution, nor article I, section 8,

---

    1.  As of January 31, 2017, the State had issued 1,718,673 concealed weapon licenses.  Fla. Dep't of Agric. & Consumer Servs., Division of Licensing, Number of Licensees by Type, https://www.freshfromflorida.com/content/download/7471/118627/Number_of_Licensees_By_Type.pdf (last visited February 7, 2017).

of the Florida Constitution.[2]  Accordingly, we affirm the Fourth District's well-reasoned opinion upholding Florida's Open Carry Law under intermediate scrutiny.  See id. at 209.

## FACTS AND PROCEDURAL HISTORY

On February 19, 2012, Dale Lee Norman received by mail a license issued by the Florida Department of Agriculture and Consumer Services authorizing Norman to carry his firearm in public in a concealed manner.  He left his Fort Pierce home on foot with a .38 caliber handgun and his new concealed-carry license.  A few minutes after he left his home, a bystander observed Norman walking alongside U.S. Highway 1 with his handgun holstered on his hip and not covered by any article of clothing.  The bystander alerted the Fort Pierce Police Department, which dispatched officers.  Fort Pierce Police Department officers arrived on the scene approximately five minutes later and also "saw [Norman] carrying a firearm in 'plain view' in a holster on his hip.  The firearm was on the outside of [Norman's] tight fitting tank top."  Norman, 159 So. 3d at 227.  A dashboard camera from a responding officer's patrol car that captured Norman's

---

2. The National Rifle Association of America ("NRA") filed an amicus curiae brief on behalf of Norman.  Everytown for Gun Safety filed an amicus curiae brief and attached an appendix of historical gun laws on behalf of the State.

arrest on video "showed that [Norman's] gun was completely exposed to public view, in its holster, and not covered by [his] shirt." Id. at 209.

Norman was charged with Open Carrying of a Weapon (firearm) in violation of section 790.053, Florida Statutes (2012), a second-degree misdemeanor carrying a maximum penalty of a $500 fine and a term of imprisonment not exceeding 60 days. See id.; see also §§ 775.082, 775.083, Fla. Stat (2012). Prior to trial in the County Court of St. Lucie County, Norman filed five motions to dismiss and challenged the constitutionality of section 790.053 on various grounds. See Norman, 159 So. 3d at 209. The county court reserved ruling on Norman's motions to dismiss until after the jury trial.

After the jury found Norman guilty of the sole count of openly carrying a firearm in violation of section 790.053, the county court denied Norman's motions to dismiss, but certified the following three questions of great public importance to the Fourth District:[3]

   I.   Is Florida's statutory scheme related to the open carry of
        firearms constitutional?
   II.  Do the exceptions to the prohibition against open carry
        constitute affirmative defenses to a prosecution for a charge of
        open carry, or does the State need to prove beyond a reasonable
        doubt that a particular defendant is not conducting himself or

---

3. Norman, 159 So. 3d at 209. Section 34.017(1), Florida Statutes (2012), permits a county court to certify questions of great public importance to the district court of appeal in a final judgment if the question "may have statewide application."

herself in the manner allowed[, meaning that they are elements of the crime]?

III.   Does the recent "brief and open display" exception unconstitutionally infect the open carry law by its vagueness?

Id. Thereafter, the county court withheld adjudication and imposed a $300 fine, along with court costs.

In answering the certified questions, the Fourth District concluded that it need not "address whether the 'brief and open display' exception unconstitutionally infects the open carry law by its vagueness because under the facts of the case this exception did not apply to [Norman.]" Id. at 209-10. Norman does not challenge this conclusion before this Court. In analyzing the two other certified questions, which Norman does challenge, the Fourth District affirmed the trial court's rulings "by holding that section 790.053, which generally prohibits the open carrying of firearms, is constitutional," and that "exceptions to the prohibition against open carry constitute affirmative defenses to a prosecution for a charge of open carry." Id. at 209.

Addressing the constitutionality of section 790.053, the Fourth District applied "a two-step analysis" that has "been employed by the majority of the federal circuit courts to consider Second Amendment challenges since the Supreme Court's decision in [District of Columbia v. ]Heller, [554 U.S. 570 (2008)]." Norman, 159 So. 3d at 210 & n.2. This two-step analysis requires first determining "whether the challenged law burdens conduct protected by the Second

- 6 -

Amendment based on a historical understanding of the scope of the [Second Amendment] right, or whether the challenged law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." Id. at 210 (quoting Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014)) (alteration in original). The second step determines the appropriate level of scrutiny to apply to the challenged law if the law burdens conduct falling under the scope of the Second Amendment right. Id. at 210-11.

The Fourth District concluded that under the first prong of its analysis, section 790.053 burdens the right, but "does not improperly infringe on Florida's constitutional guarantee, nor does it infringe on 'the central component' of the Second Amendment—the right of self-defense" because a citizen may still carry a firearm under the concealed carry licensing scheme. Id. at 219 (quoting Heller, 554 U.S. at 599). The Fourth District then interpreted Heller to establish "that Second Amendment challenges are no longer susceptible to a rational-basis review." Id. at 220 (citing Heller, 554 U.S. at 628 n.27). After reviewing various federal circuit court decisions that have considered challenges to laws impacting the Second Amendment right, the Fourth District concluded that "intermediate scrutiny is the proper standard to apply to section 790.053." Id. at 222.

In applying the intermediate scrutiny test, the Fourth District concluded that the State's interest of public safety was "compelling." Id. As to the second prong,

whether a reasonable fit existed between the challenged law and the State's asserted objectives, the Fourth District noted the difficulty of obtaining empirical proof of regulation efficacy, but nonetheless concluded that this second prong of the intermediate scrutiny test was met because "courts have traditionally been more deferential to the legislature in this area." Id. at 223. Therefore, the Fourth District concluded that section 790.053 passed the intermediate scrutiny test. Id.

The Fourth District then considered Norman's other constitutional challenges to section 790.053: that the law was unconstitutionally overbroad and that Florida's shall-issue concealed-carry licensing scheme was not an alternative channel to exercise the Second Amendment right, making the open carrying of a firearm the only available avenue for exercising the right. Id. at 223, 225. The Fourth District declined "the invitation to consider [Norman's] challenge to Florida's open carry restriction using an overbreadth analysis." Id. at 225. As to Norman's other constitutional challenge to section 790.053, the Fourth District concluded that "open carry is not the only practical avenue by which [Norman] may lawfully carry a gun in public for self-defense. Through its 'shall-issue' permitting scheme, Florida has provided a viable alternative outlet to open firearms carry which gives practical effect to its citizens' exercise of their Second Amendment rights." Id. at 226.

Addressing the other two certified questions, the Fourth District concluded that under Hodge v. State, 866 So. 2d 1270 (Fla. 4th DCA 2004), since "the exceptions are not in the enacting clause of section 790.053, but are contained within a separate statute altogether," the exceptions are affirmative defenses. Norman, 159 So. 3d at 226. Finally, in addressing the last certified question, the Fourth District concluded that Norman lacked standing to challenge the "brief and open display" exception because the county court made a finding of fact that there was no credible evidence that Norman's firearm could have been concealed before his arrest considering his manner of dress. Id. at 227. Norman petitioned this Court to review the Fourth District's decision, and we accepted jurisdiction.

## ANALYSIS

The issue we address is whether Florida's Open Carry Law, which prohibits openly carrying a firearm subject to sixteen statutory exceptions, violates the Second Amendment to the United States Constitution or article I, section 8, of the Florida Constitution. The constitutional validity of a law is a legal issue subject to de novo review. See Crist v. Ervin, 56 So. 3d 745, 747 (Fla. 2010).

In determining whether Florida's Open Carry Law is constitutional under both the Florida and the United States Constitutions, we first describe Florida's statutory scheme for possessing and carrying firearms (codified in chapter 790). We then discuss the history and scope of the rights guaranteed by the Second

Amendment to the United States Constitution and article I, section 8, of the Florida Constitution. After reviewing both federal and state case law addressing the constitutional validity of other firearm regulations, we then determine the appropriate level of review for this issue. We conclude by analyzing whether the law violates the Second Amendment or Florida's separate constitutional right to keep and bear arms for self-defense under article I, section 8 of the Florida Constitution, which is explicitly subject to the Legislature's authority to regulate the manner of doing so.[4]

---

4. Norman also contends that Florida's Open Carry Law amounts to a prior restraint on the constitutional right and violates his substantive due process rights. Norman, however, did not preserve these arguments on appeal and we, therefore, decline to discuss this claim. See Sunset Harbour Condo. Ass'n v. Robbins, 914 So. 2d 925, 928 (Fla. 2005) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved." (quoting Tillman v. State, 471 So. 2d 32, 35 (Fla. 1985))). Additionally, Norman contends that Florida's Open Carry Law is unconstitutionally "overbroad." However, as the United States Supreme Court has explained, "outside the limited First Amendment context, a criminal statute may not be attacked as overbroad." Schall v. Martin, 467 U.S. 253, 268 n.18 (1984); see also United States v. Chester, 514 Fed. Appx. 393, 395 (4th Cir. 2013) (noting that "no circuit has accepted an overbreadth challenge in the Second Amendment context."). Accordingly, we do not address this claim. We also do not discuss Norman's claim that the exemptions under section 790.25(3) are elements of the crime of openly carrying a firearm under section 790.053 because we find this claim is devoid of merit. See State v. Robarge, 450 So. 2d 855, 856-57 (Fla. 1984) (holding that under rules of statutory construction, an exception contained in a clause subsequent to the enactment clause of a statute is an affirmative defense rather than an element of the offense).

# I. CHAPTER 790, FLORIDA STATUTES

Florida's statutory scheme for regulating the manner of carrying firearms has existed in its current state for almost three decades. In 1987, the Florida Legislature passed the Jack Hagler Self-Defense Act, ch. 87-24, Laws of Fla. (1987) ("the Act"), amending section 790.06, Florida Statutes (1985). The former section 790.06 authorized local governments to issue concealed-carry licenses to applicants based on the applicant's "good moral character" and other varying criteria. § 790.06, Fla. Stat. (1985). The Act streamlined Florida's licensing scheme for carrying concealed firearms by authorizing the State to issue concealed-carry licenses, instead of local governments. At that time, Florida became one of the first states to allow the concealed carrying of firearms by a state-run licensing scheme.[5] Notable for our purposes here, Florida's "shall-issue" permitting scheme leaves no discretion to the State in issuing concealed-carry licenses, provided the applicant meets certain objective, statutory criteria. See § 790.06, Fla. Stat. (2012).

---

5. At the time of the Act, only four other states—Indiana, North Dakota, Rhode Island, and Utah—authorized the concealed carrying of firearms via a state-run permitting scheme. Richard Getchell, Carrying Concealed Weapons in Self-Defense: Florida Adopts Uniform Regulations for the Issuance of Concealed Weapons Permits, 15 Fla. St. U.L. Rev. 751, 755-56 & n.23 (1987).

Shortly after the Act went into effect, the Legislature passed in a special session House Bill 28-B, which prohibited the open carrying of firearms. See ch. 87-537, Laws of Fla. (1987). House Bill 28-B was later codified in section 790.053, Florida Statutes (1987). Representative Ronald C. Johnson, a member of the Florida House of Representatives and the sponsor of the Act, spoke on the floor of the House of Representatives and implored his colleagues to vote in favor of House Bill 28-B because "a problem ha[d] arisen in the minds of the public," concerning Florida's gun laws. This problem was brought to light in a letter Florida's then attorney general wrote to Florida's then governor, and by contemporaneous news reports that claimed that, with the recent passage of the Act, Florida law now allowed the open carrying of firearms in public. Representative Johnson stated that House Bill 28-B would clarify that in Florida, "we did not then and we do not now allow for the open carry of firearms."[6] After House Bill 28-B passed unanimously, Representative Johnson thanked his colleagues for their vote, stating that the Legislature had reaffirmed in the eyes of the public that Florida was a "safe place for individuals to live, and an excellent place for people to visit." The Senate unanimously voted the following day to

_____

6. Representative Johnson contended that because section 790.10 made it unlawful for an individual to "exhibit the [firearm] in a rude, careless, angry, or threatening manner, not in necessary self-defense," the open carrying of firearms was already illegal.

approve the concurring bill.  Therefore, it is apparent that in enacting a uniform, objective firearm licensing scheme that would allow greater availability of firearms to the public, the Legislature considered it necessary to prohibit the open carrying of firearms, subject to certain enumerated exceptions.

Florida's Open Carry Law provides in its entirety:

(1) Except as otherwise provided by law and in subsection (2), it is unlawful for any person to openly carry on or about his or her person any firearm or electric weapon or device.  It is not a violation of this section for a person licensed to carry a concealed firearm as provided in s. 790.06(1), and who is lawfully carrying a firearm in a concealed manner, to briefly and openly display the firearm to the ordinary sight of another person, unless the firearm is intentionally displayed in an angry or threatening manner, not in necessary self-defense.

(2) A person may openly carry, for purposes of lawful self-defense:
(a) A self-defense chemical spray.
(b) A nonlethal stun gun or dart-firing stun gun or other nonlethal electric weapon or device that is designed solely for defensive purposes.
(3) Any person violating this section commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

§ 790.053, Fla. Stat. (2012).

In chapter 790, the Legislature enunciated a "Declaration of Policy" with regard to the "Lawful ownership, possession, and use of firearms and other weapons":

The Legislature finds as a matter of public policy and fact that it is necessary to promote firearms safety and to curb and prevent the use of firearms and other weapons in crime and by incompetent persons

- 13 -

without prohibiting the lawful use in defense of life, home, and property, and the use by United States or state military organizations, and as otherwise now authorized by law, including the right to use and own firearms for target practice and marksmanship on target practice ranges or other lawful places, and lawful hunting and other lawful purposes.

§ 790.25(1), Fla. Stat. (2012).

Further, section 790.25(4) addresses the construction to be given to chapter 790, and provides in pertinent part:

This act shall be liberally construed to carry out the declaration of policy herein and in favor of the constitutional right to keep and bear arms for lawful purposes.  This act is supplemental and additional to existing rights to bear arms now guaranteed by law and decisions of the courts of Florida, and nothing herein shall impair or diminish any of such rights.

Id. § 790.25(4).

Except for the "brief[] and open[] display" provision added to the law in 2011, Florida's Open Carry Law has remained substantively unchanged since its passage in 1987.  See ch. 2011-145, § 1, Laws of Fla. (2011).  Under Florida's current statutory scheme, specifically Florida's Open Carry Law, openly carrying a firearm is illegal outside of the enumerated exceptions.  See § 790.053.[7]  However,

---

7. The lengthy list of exceptions to section 790.053 and section 790.06 includes:

(a) Members of the Militia, National Guard, Florida State Defense Force, Army, Navy, Air Force, Marine Corps, Coast Guard, organized reserves, and other armed forces of the state and of the

- 14 -

United States, when on duty, when training or preparing themselves for military duty, or while subject to recall or mobilization;

(b) Citizens of this state subject to duty in the Armed Forces under s. 2, Art. X of the State Constitution, under chapters 250 and 251, and under federal laws, when on duty or when training or preparing themselves for military duty;

(c) Persons carrying out or training for emergency management duties under chapter 252;

(d) Sheriffs, marshals, prison or jail wardens, police officers, Florida highway patrol officers, game wardens, revenue officers, forest officials, special officers appointed under the provisions of chapter 354, and other peace and law enforcement officers and their deputies and assistants and full-time paid peace officers of other states and of the Federal Government who are carrying out official duties while in this state;

(e) Officers or employees of the state or United States duly authorized to carry a concealed weapon;

(f) Guards or messengers of common carriers, express companies, armored car carriers, mail carriers, banks, and other financial institutions, while actually employed in and about the shipment, transportation, or delivery of any money, treasure, bullion, bonds, or other thing of value within this state;

(g) Regularly enrolled members of any organization duly authorized to purchase or receive weapons from the United States or from this state, or regularly enrolled members of clubs organized for target, skeet, or trap shooting, while at or going to or from shooting practice; or regularly enrolled members of clubs organized for modern or antique firearms collecting, while such members are at or going to or from their collectors' gun shows, conventions, or exhibits;

(h) A person engaged in fishing, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition;

(i) A person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person while engaged in the lawful course of such business;

(j) A person firing weapons for testing or target practice under safe conditions and in a safe place not prohibited by law or going to or from such place;

(k) A person firing weapons in a safe and secure indoor range for testing and target practice;

(l) A person traveling by private conveyance when the weapon is securely encased or in a public conveyance when the weapon is securely encased and not in the person's manual possession;

(m) A person while carrying a pistol unloaded and in a secure wrapper, concealed or otherwise, from the place of purchase to his or her home or place of business or to a place of repair or back to his or her home or place of business;

(n) A person possessing arms at his or her home or place of business;

(o) Investigators employed by the several public defenders of the state, while actually carrying out official duties, provided such investigators:

1. Are employed full time;

2. Meet the official training standards for firearms established by the Criminal Justice Standards and Training Commission as provided in s. 943.12(5) and the requirements of ss. 493.6108(1)(a) and 943.13(1)-(4); and

3. Are individually designated by an affidavit of consent signed by the employing public defender and filed with the clerk of the circuit court in the county in which the employing public defender resides.

Florida's Open Carry Law does not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a concealed manner and the individual has received a concealed-carry license. Id. § 790.06(2).

As explained above, Florida's "shall-issue" licensing scheme provides almost every individual the ability to carry a concealed weapon. The statute merely requires the applicant to provide a statement that he or she "[d]esires a legal means to carry a concealed weapon or firearm for lawful self-defense" and that the applicant meets certain objective requirements. Id. These objective requirements include that the applicant is not a convicted felon, has not been committed to a mental institution, and has demonstrated competence with handling a firearm. Id. Thus, under Florida's "shall-issue" licensing scheme, the State has no discretion in

---

(p) Investigators employed by the capital collateral regional counsel, while actually carrying out official duties, provided such investigators:

1. Are employed full time;

2. Meet the official training standards for firearms as established by the Criminal Justice Standards and Training Commission as provided in s. 943.12(1) and the requirements of ss. 493.6108(1)(a) and 943.13(1)-(4); and

3. Are individually designated by an affidavit of consent signed by the capital collateral regional counsel and filed with the clerk of the circuit court in the county in which the investigator is headquartered.

§ 790.25(3), Fla. Stat. (2012).

issuing licenses and may not withhold a license from an individual based on any subjective beliefs, provided the applicant meets the objective, statutory requirements. See id.

In short, chapter 790 allows anyone with a concealed-carry license, which are granted liberally, to carry a firearm in public, so long as the firearm is concealed. Having explained Florida's Open Carry Law, we next explain the history and scope of the constitutional rights, both federal and state, at issue in this case.

## II. FEDERAL AND STATE CONSTITUTIONAL RIGHT TO BEAR ARMS

Norman challenges the constitutionality of Florida's Open Carry Law under both the Second Amendment to the United States Constitution and article I, section 8, of the Florida Constitution. We explain below the history and scope of these rights, both through constitutional text and case law. Put simply, Florida's right provides explicitly to Floridians what the United States Supreme Court has interpreted the federal right to guarantee—an individual right to bear arms for self-defense, subject to legislative regulation.

## A. History and Scope of the Right Provided by the Second Amendment to the United States Constitution

The Second Amendment to the United States Constitution states, in full:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

In 2008, in <u>District of Columbia v. Heller</u>, the United States Supreme Court thoroughly analyzed the history of this constitutional guarantee in reviewing the constitutionality of a District of Columbia law that entirely banned the possession of handguns in the home and required that firearms otherwise lawfully allowed to be kept in the home be rendered inoperable. 554 U.S. at 628. In a 5-4 decision, the Court invalidated the District of Columbia law, <u>id.</u> at 592, 635,[8] and concluded that the Second Amendment provides an individual right to bear arms that is grounded in self-defense. <u>Id.</u> at 599 (noting that the "<u>central component</u>" of the Second Amendment was and remains self-defense).[9] One basis for the Court's

---

8. As the Court explained, this ban required "that firearms in the home be rendered and kept inoperable at all times" and prevented citizens using them "for the core lawful purpose of self-defense." <u>Heller</u>, 554 U.S. at 630.

9. Justice Stevens and Justice Breyer each wrote a dissenting opinion that the other joined. Justices Souter and Ginsburg concurred with both dissents. Justice Stevens's dissent argued that "[n]either the text of the Amendment nor the arguments advanced by its proponents evidenced the slightest interest in limiting any legislature's authority to regulate private civilian uses of firearms. Specifically, there is no indication that the Framers of the Amendment intended to enshrine the common-law right of self-defense in the Constitution." 554 U.S. at 637 (Stevens, J., dissenting).

Justice Breyer's dissent agreed with Justice Stevens's dissent "that the Second Amendment protects milita-related, not self-defense-related, interests." <u>Id.</u> at 681 (Breyer, J., dissenting). Additionally, Justice Breyer argued "that the protection the Amendment provides is not absolute." <u>Id.</u> Justice Breyer concluded that District of Columbia's regulation, "which focuses upon the presence of handguns in high-crime urban areas, represents a permissible legislative response to a serious, indeed life-threatening, problem." <u>Id.</u> at 681-82.

conclusion that the Second Amendment guarantees an individual right, not connected to service in a militia, was a review of post-Civil War legislation that concerned "how to secure constitutional rights for newly freed slaves." Id. at 614. As the Heller Court explained, "[b]lacks were routinely disarmed by Southern States after the Civil War." Id.[10]

After determining that the Second Amendment guarantees an individual right, in Heller the majority avoided explicitly "establish[ing] a level of scrutiny for evaluating Second Amendment restrictions." 554 U.S. at 634. Instead, the Court stated that the law at issue in Heller would fail under "any of the standards of scrutiny [the Court has] applied to enumerated constitutional rights." Id. at 628. However, the Court explicitly noted that the Second Amendment's individual right is not unlimited, and, historically, the right has been subject to laws prohibiting how firearms are carried, including antebellum laws prohibiting the concealed

---

10. As one antebellum commentator noted of the slave-holding South:

> [I]t is considered essential to personal safety, to carry concealed weapons. This single fact shows that personal security is at the lowest ebb. When a man must protect himself, for what is he indebted to the laws? These weapons are no doubt carried partly as a protection against the slaves; but they are chiefly used, in quarrels between freemen.

Richard Hildreth, Despotism in America: An Inquiry into the Nature, Results, and Legal Basis of the Slave-Holding System in the United States 90 (1854) (emphasis added).

carrying of weapons. Id. at 626-27.[11] Indeed, as one scholar has explained,

"[e]ven in Dodge City, that epitome of the Wild West, gun carrying was

prohibited." Saul Cornell, The Right to Carry Firearms Outside of the Home:

Separating Historical Myths from Historical Realities, 39 Fordham Urb. L.J. 1695,

1724 (2012).[12]

_____

11. Both Norman and the dissent argue that the Heller Court's reference to the antebellum cases of Nunn v. State, 1 Ga. 243 (1846) and State v. Chandler, 5 La. Ann. 489 (1850), confirm that the historical right protected by the Second Amendment was the right to openly carry in public. See dissenting op. at 3-5 (Canady, J., dissenting). We reject the notion that the historical right protected by the Second Amendment is the right to openly carry. See Heller, 554 U.S. at 626. As one constitutional scholar has noted, "[t]he notion of a strong tradition of a right to carry outside of the home rests on a set of historical myths and a highly selective reading of the evidence. The only persuasive evidence for a strong tradition of permissive open carry is limited to the slave South." Saul Cornell, The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities, 39 Fordham Urb. L.J. 1695, 1723 (2012). Put simply, we read the Heller Court's reference to these antebellum cases not as supporting an interpretation of the Second Amendment as guaranteeing the right to openly bear arms in public, but supporting the Court's interpretation of the right as "not unlimited." Heller, 554 U.S. at 626.

12. Indeed, most states outside of the South in the mid-nineteenth century prohibited in most instances the carrying of firearms in public, whether carried concealed or openly:

> 19 Del. Laws 733 (1852); D.C. Code § 16 (1857) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person . . . ."); Me. Rev. Stat. tit. 12 § 16 (1840) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself . . . ."); Wis. Stat. § 16 (1857) ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols,

Two years after <u>Heller</u>, in <u>McDonald v. City of Chicago</u>, 561 U.S. 742

(2010), the United States Supreme Court considered a broad-sweeping handgun

ban in Chicago, which was "similar to the District of Columbia's" that was at issue

in <u>Heller</u> because it prevented possession of "any firearm unless such person is the

holder of a valid registration certificate for such firearm." <u>Id.</u> at 750 (quoting

Chicago, Ill., Municipal Code § 8-20-040(a) (2009)).[13] Relying on <u>Heller</u>, the

---

or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person . . . ."); John Purdon, <u>A Digest of the Laws of Pennsylvania, From the Year One Thousand Seven Hundred to the Twenty-First Day of May, One Thousand Eight Hundred and Sixty-One</u> 250 (9th ed., 1862) ("If any person, not being an officer on duty in the military or naval service of the state or of the United States, shall go armed with a dirk, dagger, sword or pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury or violence . . . ."); <u>The Statutes of Oregon, Enacted, and Continued in Force, by the Legislative Assembly</u> 243 (1855); George B. Young, <u>The General Statutes of the State of Minnesota, as Amended by Subsequent Legislation, With Which are Incorporated All General Laws of the State in Force At the Close of the Legislative Session of 1878</u> 629 (St. Paul, 1879) ("Whoever goes armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapons, without reasonable cause to fear an assault or other injury or violence to his person . . . .").

Cornell, <u>The Right to Carry Firearms Outside of the Home</u>, 39 Fordham Urb. L.J. at 1722 n.141.

13. The Chicago ordinance at issue in <u>McDonald</u> "prohibit[ed] registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City." 561 U.S. at 750 (citing Chicago, Ill., Municipal Code § 8-20-050(c) (2009)). A similar ordinance in the Chicago suburb of the Village of Oak Park was also at issue in <u>McDonald</u>. <u>Id.</u>

McDonald Court struck down the handgun ban at issue. Id. at 791. In reviewing the handgun ban, the Court noted that its previous decision in Heller "protects the right to possess a handgun in the home for the purpose of self-defense," id., and the plurality opinion "recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " Id. at 786 (quoting Heller, 554 U.S. at 626). Significantly, after an exhaustive review of its selective incorporation jurisprudence, the Court applied the Second Amendment to the States via the Due Process Clause of the Fourteenth Amendment. Id. at 791.

Recently, the United States Supreme Court shed further light on the scope of the Second Amendment in Caetano v. Massachusetts, 136 S. Ct. 1027 (2016). In Caetano, the Court reviewed a judgment of the Supreme Judicial Court of Massachusetts upholding a Massachusetts law prohibiting the possession of stun guns, reasoning "stun gun[s] [were not] the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment." 136 S. Ct. at 1027 (quoting Commonwealth v. Caetano, 26 N.E.3d 688, 691 (Mass. 2015)). On review, the Supreme Court vacated the judgment, finding that this explanation contradicted Heller's "statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding." Id. at 1028

(quoting Heller, 554 U.S. at 582).  Thus, the Caetano Court confirmed that the Second Amendment is a right evolving with advances in technology.  See id.

The Court also recently considered "whether a misdemeanor conviction for recklessly assaulting a domestic relation disqualifies an individual from possessing a gun under [a federal law prohibiting possession of firearms by persons previously convicted of a misdemeanor crime of domestic violence]."  Voisine v. United States, 136 S. Ct. 2272, 2277-78 (2016).  Importantly, in holding that the federal law applied to reckless assaults in addition to knowing or intentional ones, the Court chose not to address Voisine's claim that the law violated the Second Amendment and, instead, resolved the issue on statutory interpretation grounds. See id. at 2278-80.  But see id. at 2290 (Thomas, J., dissenting) (noting that the majority's statutory construction of the statute at issue improperly extended the "statute into . . .  constitutionally problematic territory").

While the Supreme Court in Heller and McDonald struck down laws that, by design and effect, totally prohibited the use of operable firearms in the home, the Court has not further defined the scope of the Second Amendment to preclude laws regulating the manner of how arms are borne.  Indeed, the Court acknowledged that its decision in Heller left "many applications of the right to keep and bear arms in doubt," 554 U.S. at 635, and clarified in Caetano that the right evolves with advances in technology.  See 136 S. Ct. at 1028.

In the eight years since Heller, federal circuit courts have considered an array of Second Amendment challenges to laws regulating the manner and use of firearms. For instance, the Second, Third, Fourth, Ninth, and Tenth Circuits have all considered and upheld state laws either prohibiting entirely the concealed carrying of firearms or requiring a demonstration of "good cause" or a "justifiable need" before a person is licensed to carry concealed firearms. Some federal circuit courts have held that laws prohibiting the concealed carrying of firearms without first demonstrating a subjective "good cause," did not even implicate the Second Amendment. For instance, the Ninth Circuit in Peruta v. County of San Diego, 824 F.3d 919 (9th Cir. 2016), conducted a historical examination of the Second Amendment and, based on this historical analysis, held "that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public." Id. at 939. The Tenth Circuit has also held "that the concealed carrying of firearms falls outside the scope of the Second Amendment's guarantee," but did not conduct a historical examination of the Second Amendment right as the Ninth Circuit conducted in Peruta. Peterson v. Martinez, 707 F.3d 1197, 1212 (10th Cir. 2013). In Peterson, the petitioner challenged a residency requirement of Colorado's "shall issue" permitting scheme for the concealed carrying of firearms as violating the Second Amendment, even though Colorado law permitted nonresidents to openly

- 25 -

carry firearms in the state.  Id. at 1209.  Importantly, the Tenth Circuit did not premise its holding on the fact that residents and nonresidents of Colorado may openly carry.  See id.

Similarly, the Fourth Circuit considered a Maryland law requiring that handgun permits be issued only to individuals with "good-and-substantial-reason" to wear, carry (open or concealed), or transport a handgun.  Woollard v. Gallagher, 712 F.3d 865, 868 (4th Cir. 2013).  Unlike the Ninth and Tenth Circuits, however, the Fourth Circuit "refrain[ed] from any assessment of whether Maryland's good and substantial reason requirement for obtaining a handgun permit implicate[d] Second Amendment protections," but concluded that the law nevertheless passed constitutional muster under intermediate scrutiny.  Id. at 876.

In holding that the law passed intermediate scrutiny, the Fourth Circuit noted that "intermediate scrutiny applies to laws burdening any right to carry firearms outside the home, where 'firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.' " Id. at 882 (quoting United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011)).  The Third Circuit considered a similar, subjective "justifiable need" restriction on carrying handguns in public (without distinguishing between open and concealed carrying) in Drake v. Filko, 724 F.3d 426 (3d Cir. 2013), and concluded that the law did "not burden conduct within the scope of the Second Amendment's

guarantee." Id. at 429. Regardless, the Third Circuit held that even if the "justifiable need" restriction was not presumptively lawful, it would still pass intermediate scrutiny. Id. at 430. The Third Circuit noted that the law "fits comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense. In fact, it does not go as far as some of the historical bans on public carrying; rather, it limits the opportunity for public carrying to those who can demonstrate a justifiable need to do so." Id. at 433.

In contrast, the Second Circuit concluded that New York's "proper cause" restriction to obtain a license to carry a concealed firearm implicated the Second Amendment in Kachalsky v. County of Westchester, 701 F.3d 81, 93 (2d Cir. 2012). However, like its sister courts that have subjected laws regulating the carrying of firearms in public to some level of scrutiny, the Second Circuit held that the "proper cause" restriction passed intermediate scrutiny. Id. at 96, 100. Explaining that the law passed intermediate scrutiny, the Second Circuit noted that "extensive state regulation of handguns has never been considered incompatible with the Second Amendment or, for that matter, the common-law right to self-defense. This includes significant restrictions on how handguns are carried, complete prohibitions on carrying the weapon in public, and even in some instances, prohibitions on purchasing handguns." Id. at 100. Therefore, federal circuit courts have found restrictions on the public carrying of firearms as not only

surviving intermediate scrutiny, but, in some instances, not even implicating the

Second Amendment right at all.  See Drake, 724 F.3d at 429-30.[14]

## B. History and Scope of the Right Provided by Article I, Section 8, of the Florida Constitution

Not only is the Federal right to bear arms applicable to the states under

McDonald by selective incorporation through the Due Process Clause of the

Fourteenth Amendment, but the Florida Constitution includes a separate

constitutional right to bear arms in article I, section 8.  Specifically, the Florida

Constitution provides:

> The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the state shall not be infringed, except that the manner of bearing arms may be regulated by law.

Art. I, § 8(a), Fla. Const. (emphasis added).  In contrast to the federal right,

Florida's Constitution explicitly states that the purpose of the constitutional right is

---

14. Consistent with Heller, federal circuit courts have also upheld federal laws prohibiting felons, domestic abusers, and specific misdemeanants from possessing firearms.  See Heller, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . .").  Likewise, federal circuit courts have also upheld federal regulations restricting the possession of firearms in national parks and other sensitive, public places.  Id. ("[N]othing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places . . . ."); Bonidy v. U.S. Postal Serv., 790 F.3d 1121 (10th Cir. 2015); Masciandaro, 638 F.3d 458.

self-defense while simultaneously expressly limiting that right by providing the Legislature the authority to regulate the manner of bearing arms.

This constitutional right has endured in Florida—with only a small gap—since 1838 when Florida's Constitution was adopted by the then Territory of Florida. Fla. Carry v. Univ. of N. Fla., 133 So. 3d 966, 983-84 (Fla. 1st DCA 2013) (Makar, J., concurring).[15] When Florida's current Constitution was adopted in 1968, the explicit right of the Legislature to regulate the manner in which arms are borne first announced in the 1885 Constitution remained.

Near the turn of the twentieth century, in one of this Court's earliest decisions interpreting Florida's constitutional right to keep and bear arms for self-defense, this Court recognized in Carlton v. State, 58 So. 486 (Fla. 1912), that article I, section 20, the precursor to today's constitutional right, which was

---

15. The 1865 Constitution omitted the right, but the right was added back in the 1868 Constitution, which stated: "The people shall have the right to bear arms in defense of themselves and of the lawful authority of the State." Art. I, § 22, Fla. Const. (1868). We note that the 1865 Constitution was never legally in effect. Congress rejected it when deciding whether to readmit Florida to the Union following the Civil War because the document did not provide sufficient protection for the newly freed slaves. That language was similar to the original 1838 version, which stated that "the free white men of this State shall have the right to keep and bear arms, for their common defense," but was later amended in the 1885 Constitution to specifically reflect that the Legislature may regulate the manner in which arms are borne: "The right of the people to bear arms in defense of themselves and the lawful authority of the state shall not be infringed, but the Legislature may prescribe the manner in which they may be borne." Art. I, § 20, Fla. Const. (1885).

contained in the 1885 Constitution's Declaration of Rights, was "intended to give the people the means of protecting themselves against oppression and public outrage, and was not designed as a shield for the individual man, who is prone to load his stomach with liquor and his pockets with revolvers or dynamite, and make of himself a dangerous nuisance to society." Id. at 488.

A former member of this Court also echoed the Heller Court's statement that some early gun laws were enacted with a racial motivation in mind. As Justice Buford explained in Watson v. Stone, 4 So. 2d 700 (Fla. 1941), when concurring specially in a decision of this Court, which applied the rule of lenity to strictly construe the predecessor of section 790.05 in favor of the defendant:

> The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.

Id. at 703 (Buford, J., concurring specially) (emphasis added).

Consistent with the plain language of article I, section 8, and its predecessor providing that the Legislature may regulate the manner and use of firearms, as well as the Heller Court's interpretation of the federal right as not unlimited, the Legislature has enacted various laws regulating the manner in which arms are carried. This Court has upheld these various regulations of this constitutional right upon challenge. For instance, in Nelson v. State, 195 So. 2d 853 (Fla. 1967), this Court concluded that the "statutory prohibition of possession of a pistol by one convicted of a felony, civil rights not restored, [was] a reasonable public safeguard." Id. at 855-56. Then, in Rinzler v. Carson, 262 So. 2d 661 (Fla. 1972), this Court upheld a statute that barred the usage of an entire class of firearms, explaining that "[a]lthough the Legislature may not entirely prohibit the right of the people to keep and bear arms," pursuant to article I, section 8, "it can determine that certain arms or weapons may not be kept or borne by the citizen." Id. at 665. In doing so, the Court did not apply any level of scrutiny and noted that it had previously upheld other regulations enacted by the Legislature that regulated the use and manner of bearing specific weapons:

> In Nelson v. State, 195 So. 2d 853 (1967) we held constitutional Section 790.23, Florida Statutes, F.S.A., which makes it unlawful for a convicted felon to have in his possession a pistol, sawed-off rifle, or sawed-off shotgun. In Davis v. State, 146 So. 2d 892 (1962) we held valid Section 790.05, Florida Statutes of 1961, which made it a criminal offense for any person to carry around with him or to have in his manual possession a pistol, Winchester rifle or other repeating rifle in a county without a license from the county

- 31 -

commissioners. In <u>Carlton v. State</u>, 63 Fla. 1, 58 So. 486 (1912) we upheld as valid against the contention that it unlawfully infringed upon the right of the citizen to bear arms a statute of this State which made it unlawful to carry concealed weapons.

<u>Rinzler</u>, 262 So. 2d at 665-66.

As we recognized in <u>Rinzler</u>, inherent in the holdings of these cases is the acknowledgment that under the Florida Constitution, "<u>the right to keep and bear arms is not an absolute right</u>, but is one which is subject to the right of the people through their legislature to enact valid police regulations to promote the health, morals, safety and general welfare of the people." <u>Id.</u> at 666 (emphasis added). In light of <u>Heller</u>'s clarification that the federal right under the Second Amendment is not unlimited, the Florida right is, thus, consistent with the federal right.

## III. DETERMINING THE APPROPRIATE LEVEL OF SCRUTINY

In reviewing Norman's claim that section 790.053 violates the Second Amendment to the United States Constitution, we apply the two-step analysis that has been employed by the United States Court of Appeals for the Eleventh Circuit in <u>GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs</u>, 788 F.3d 1318, 1322 (11th Cir. 2015), and nearly every other federal circuit court of appeal after <u>Heller</u> and <u>McDonald</u> to determine the appropriate the level of scrutiny.[16] The Fourth

---

16. <u>Ezell v. City of Chicago</u>, 846 F.3d 888, 892 (7th Cir. 2017); <u>N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo</u>, 804 F.3d 242, 260 (2d Cir. 2015); <u>United States v. Chovan</u>, 735 F.3d 1127, 1136 (9th Cir. 2013); <u>Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, 700 F.3d 185, 194

District expressly applied this two-step inquiry in <u>Norman</u>, 159 So. 3d at 210-11.

As the Fourth District explained, under this two-step analysis:

> First, we determine "whether the challenged law burdens conduct protected by the Second Amendment based on a historical understanding of the scope of the [Second Amendment] right, or whether the challenged law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." <u>Jackson</u>, 746 F.3d at 960 (alteration in original) (citations omitted) (internal quotation marks omitted). To answer this question, "we ask whether the regulation is one of the presumptively lawful regulatory measures identified in <u>Heller</u>[], or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." <u>Id.</u> (citations omitted) (internal quotation marks omitted). If the provision is not "within the historical scope of the Second Amendment," <u>id.</u>, then it is constitutional. <u>See id.</u>; <u>see also</u> <u>Nat'l Rifle Ass'n</u>, 700 F.3d at 195. If it is within the scope, we must proceed to the second step of the analysis.
> At step two, we must "determine the appropriate level of scrutiny" to apply to the provision at issue. <u>Jackson</u>, 746 F.3d at 960.

<u>Norman</u>, 159 So. 3d at 210-11.

In this case, the first prong is met. Florida's Open Carry Law, which regulates the manner of how arms are borne, imposes a burden on conduct falling within the scope of the Second Amendment. The law prohibits, in most instances, one manner of carrying arms in public, thereby implicating the "central

---

(5th Cir. 2012); <u>United States v. Greeno</u>, 679 F.3d 510, 518 (6th Cir. 2012); <u>Heller v. Dist. of Columbia</u>, 670 F.3d 1244, 1252 (D.C. Cir. 2011); <u>United States v. Chester</u>, 628 F.3d 673, 680 (4th Cir. 2010); <u>United States v. Reese</u>, 627 F.3d 792, 800-01 (10th Cir. 2010); <u>United States v. Marzzarella</u>, 614 F.3d 85, 89 (3d Cir. 2010). Only the Eighth Circuit Court of Appeals has not yet relied on this analysis.

component" of the Second Amendment—the right of self-defense. Thus, we turn to step two.

We must next determine the appropriate level of scrutiny to apply in reviewing the validity of Florida's Open Carry Law, codified in section 790.053. As the Heller Court explained, there are three "traditionally expressed levels" of scrutiny: rational basis, intermediate scrutiny, and strict scrutiny. Heller, 554 U.S. at 634. As this Court has clarified, "[e]ach level has a concomitant presumption of validity or invalidity and standard of proof." N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So. 2d 612, 625 (Fla. 2003). Rational basis review is the most deferential to the State, as "a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 314 (1976). Although Heller provided little guidance to courts reviewing constitutional challenges to gun regulations under the Second Amendment, it foreclosed subjecting the kind of regulation at issue here to rational basis review. See Heller, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Therefore, we are left to choose between strict and intermediate scrutiny.

On the opposite end of the spectrum of constitutional analysis from rational basis review is strict scrutiny, the most rigorous level of review. See Korematsu v. United States, 323 U.S. 214, 216 (1944); see also N. Fla. Women's Health, 866 So. 2d at 625. If a law impairs the exercise of a fundamental right, it must pass strict scrutiny. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). The law is presumptively unconstitutional. See N. Fla. Women's Health, 866 So. 2d at 625 n.16. Laws reviewed under strict scrutiny must "further[] a compelling interest" and be "narrowly tailored to achieve that interest." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010) (quoting Federal Elections Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007)); see also D.M.T. v. T.M.H., 129 So. 3d 320, 339 (Fla. 2013) ("Strict scrutiny . . . requires the State to prove that the legislation furthers a compelling governmental interest through the least intrusive means."). When a law is reviewed under strict scrutiny, the State bears the burden of proving its validity. Fisher v. Univ. of Tex. at Austin, 133 S. Ct. 2411, 2421 (2013).

Somewhere between rational basis review and strict scrutiny is intermediate scrutiny. Under this less rigorous standard, the challenged law "must be substantially related to an important governmental objective." Clark v. Jeter, 486 U.S. 456, 461 (1988). While the State still bears the burden under this standard, the relationship between the Legislature's ends and means need only be a

"reasonable fit." Chester, 628 F.3d at 683 (citing Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).

As the Fourth District explained, in deciding whether strict or intermediate scrutiny is appropriate to apply to Second Amendment challenges, federal courts

> look at "(1) 'how close the law comes to the core of the Second Amendment right [of self-defense]' and (2) 'the severity of the law's burden on the right.' " [Jackson, 746 F.3d] at 960-61 (quoting Chovan, 735 F.3d at 1138). Moreover, in applying step two, we remain mindful that "[a] law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." Id. at 961 (alteration in original) (quoting Heller[], 554 U.S. at 629, 128 S. Ct. 2783).

Norman, 159 So. 3d at 210-11. This guide is informed by Heller's emphasis on "the weight of the burden imposed by the D.C. gun laws." United States v. Decastro, 682 F.3d 160, 166 (2d Cir. 2012). The D.C. gun laws invalidated by Heller made "it impossible for citizens to use [handguns] for the core lawful purpose of self-defense." Heller, 554 U.S. at 630 (emphasis added). Thus, if the law leaves open an alternative outlet to exercise the right—here, Florida's shall-issue concealed-carry licensing scheme—then the law is "less likely to place a severe burden on the Second Amendment right than those which do not." Jackson, 746 F.3d at 961 (citing Marzzarella, 614 F.3d at 97).

As to the first prong, Florida's Open Carry Law is related to the core of the constitutional right to bear arms for self-defense because it prohibits the open

carrying of firearms in public where a need for self-defense exists. See, e.g.,

Moore v. Madigan, 702 F.3d 933, 937 (7th Cir. 2012) ("To confine the right to be

armed to the home is to divorce the Second Amendment from the right of self-

defense described in Heller and McDonald.").  However, Florida's Open Carry

Law is not so close to the "core" of this right as to prevent people from defending

themselves.  Indeed, under Florida's permissive "shall-issue" licensing scheme,

most individuals are not prevented from carrying a firearm in public for self-

defense.

Turning to the second prong, which is the severity of the law's burden on the

right, as the Fourth District recited, "we remain mindful that '[a] law that imposes

such a severe restriction on the core right of self-defense that it "amounts to a

destruction of the [Second Amendment] right," (quoting Jackson, 746 F.3d at 961)

is unconstitutional under any level of scrutiny.' " Norman, 159 So. 3d at 211.

However, if the regulation leaves open an alternative outlet to exercise the right,

then the regulation is "less likely to place a severe burden on the . . . right than

those which do not." Jackson, 746 F.3d at 961 (citing Marzzarella, 614 F. 3d at

97); Decastro, 682 F.3d 160, 166, 168 (2d Cir. 2012).  As we have explained,

Florida's permissive, shall-issue, concealed-carry licensing scheme clearly

"leave[s] open alternative channels" to exercise the right. Jackson, 746 F.3d at 961

(citing Marzzarella, 614 F. 3d at 97).

Significantly, unlike the laws at issue in Heller and McDonald, which

completely banned the possession of handguns in one's home, Florida's Open

Carry Law regulates only how firearms are borne in public. Because this law does

not amount to an entire ban on a class of guns or completely prohibit the bearing of

firearms in public and does not affect the right to keep arms in one's home, "where

the need for defense of self, family, and property is most acute," Heller, 556 U.S.

at 628, we conclude that Florida's Open Carry Law does not severely burden the

right. As the Third Circuit Court of Appeals has explained, a law that "was neither

designed to nor has the effect of prohibiting the possession of any class of firearms

. . . is more accurately characterized as a regulation of the manner in which persons

may lawfully exercise their Second Amendment rights." Marzzarella, 614 F.3d at

97.

Thus, like every federal circuit court that has reviewed a challenged law that

closely relates to the Second Amendment but does not completely ban the

possession or use of firearms, we conclude that intermediate scrutiny is

appropriate.[17] The Tenth Circuit cogently set forth the reason why intermediate

_____

    17. See Tyler v. Hillsdale Cty. Sheriff's Dep't., 837 F.3d 678, 692 (6th Cir.
2016) (holding that intermediate scrutiny was the appropriate standard to apply
when reviewing challenged law not burdening the core of the Second Amendment
right but placing a substantial burden on conduct and persons protected by the
Second Amendment); Jackson, 746 F.3d at 965 (applying intermediate scrutiny to
San Francisco ordinance prohibiting handgun possession in one's own home unless
the handgun is stored or disabled with a trigger lock or is carried on the person of

scrutiny, rather than strict scrutiny, is more appropriate for reviewing laws regulating the use of firearms.  As the Tenth Circuit explained when it considered a Second Amendment challenge to a federal regulation prohibiting the storage and carriage of firearms on property owned by the United States Postal Service, "[i]ntermediate scrutiny makes sense in the Second Amendment context," because

> [t]he right to carry weapons in public for self-defense poses inherent risks to others.  Firearms may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate.  The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others.  Intermediate scrutiny appropriately places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety.

someone over the age of 18); Chovan, 735 F.3d at 1137-38 (subjecting law prohibiting domestic violence misdemeanants from possessing firearms to intermediate scrutiny); Drake, 724 F.3d at 436 (applying intermediate scrutiny when reviewing New Jersey law limiting the issuance of handgun permits to those who can show a "justifiable need"); Nat'l Rifle Ass'n of America, Inc., 700 F.3d at 205 (applying intermediate scrutiny to federal law prohibiting federally licensed firearm dealers from selling handguns to persons under the age of 21); United States v. Mahin, 668 F.3d 119, 124 (4th Cir. 2012) (subjecting federal law disallowing gun possession by individuals subject to domestic violence protective orders to intermediate scrutiny); United States v. Chapman, 666 F.3d 220, 226 (4th Cir. 2012) (same); United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010) (subjecting federal law banning felons from possessing firearms to intermediate scrutiny).

Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015) (emphasis added).

In accordance with the federal courts that have considered the issue and in accordance with the analytical framework set forth by the Fourth District in Norman, we review section 790.053—Florida's Open Carry Law—under intermediate scrutiny.

## IV.  REVIEWING SECTION 790.053 UNDER INTERMEDIATE SCRUTINY

As we have explained, under intermediate scrutiny, the challenged law "must be substantially related to an important governmental objective." Clark, 486 U.S. at 461; see also T.M v. State., 784 So. 2d 442, 443 n.1 (Fla. 2001).  While the terminology may at times differ, intermediate scrutiny requires "the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or important," and requires that "the fit between the challenged regulation and the asserted objective be reasonable, not perfect." Marzzarella, 614 F.3d at 98.

Regarding the first prong of the intermediate scrutiny test—whether the law has an "important governmental objective"—the governmental interests furthered by section 790.053 are undoubtedly important. Clark, 486 U.S. at 461.  The Legislature, in its "Declaration of Policy" regarding the "Lawful ownership, possession, and use of firearms and other weapons," under chapter 790 found: "[A]s a matter of public policy[,] . . . it is necessary to promote firearms safety and

- 40 -

to curb and prevent the use of firearms and other weapons in crime and by incompetent persons without prohibiting the lawful use in defense of life, home, and property . . . ." § 790.25(1), Fla. Stat. (2012).[18]  As section 790.25(4) states, the provisions of chapter 790 "shall be liberally construed to carry out the declaration of policy."  Likewise, the United States Supreme Court has stated that the "'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."  Schall v. Martin, 467 U.S. 253, 264 (1984) (quoting DeVeau v. Braisted, 363 U.S. 144, 155 (1960)).  Thus, we conclude that the State has satisfied the first prong of intermediate scrutiny, as the government's interest in ensuring public safety by reducing firearm-related crime is undoubtedly critically important.

---

18.  Norman contends that because the Declaration of Policy for chapter 790 was enacted prior to the enactment of section 790.053, based on this Court's decision in Florida Virtual Sch. v. K12, Inc., 148 So. 3d 97, 101-02 (Fla. 2014), it cannot be cited as an articulation of the State's important government interest. However, Florida Virtual School merely recited a principle of statutory construction that a "more recently enacted statute will control over older statutes." Id. at 102.  That same decision states that, regarding this principle of statutory construction, "the more recently enacted provision may be viewed as the clearest and most recent expression of legislative intent."  Id. (quoting Palm Bch Cty. Canvassing Bd. v. Harris, 772 So. 2d 1273, 1287 (Fla. 2000)).  The Legislature was aware of the Declaration of Policy contained in section 790.25 when section 790.053 was first enacted in 1987.  It has further been aware of the Declaration of Policy in the five times the Legislature has amended or revised section 790.053. Put simply, the enactment of section 790.053 did not abrogate chapter 790's Declaration of Policy.

As to the second prong of intermediate scrutiny, our task is to determine whether section 790.053 "reasonably fits" or "substantially relates" to the stated government purpose of public safety and reducing gun violence. We conclude that it does. The State, in briefing before this Court, contends that by restricting open carry, but permitting concealed carry:

> [T]he Legislature has reasonably concluded that concealed carry serves the State's interests, while open carry does not. An armed attacker engaged in the commission of a crime, for example, might be more likely to target an open carrier than a concealed carrier for the simple reason that a visibly armed citizen poses a more obvious danger to the attacker than a citizen with a hidden firearm.

Before the Fourth District, the State argued that by restricting how firearms are carried in public so that they may only be carried in a concealed manner under a shall-issue licensing scheme, deranged persons and criminals would be less likely to gain control of firearms in public because concealed firearms—as opposed to openly carried firearms—could not be viewed by ordinary sight.

Norman contends that the State has not produced evidence that Florida's Open Carry Law reasonably fits the State's important government interest. However, under intermediate scrutiny review, the State is not required to produce evidence in a manner akin to strict scrutiny review.

Consistent with the government's "considerable flexibility to regulate gun safety," Bonidy, 790 F.3d at 1126, when reviewing challenged gun regulations under intermediate scrutiny, federal courts have upheld gun regulations by the

- 42 -

government if they reasonably comport with important governmental interests, even if the government did not justify the restriction with data or statistical studies.

Indeed, in Masciandaro, the Fourth Circuit upheld under intermediate scrutiny a federal regulation prohibiting the carrying or possessing of a loaded handgun in a motor vehicle in a national park because the Secretary of the Interior "could have reasonably concluded" that the regulation was reasonably adapted to the substantial government interest of public safety. 638 F.3d at 473. Similarly, in Williams, the Seventh Circuit upheld under intermediate scrutiny a federal law dispossessing felons of firearms, concluding that the government had proven that the law was substantially related to the important governmental interest of preventing felons access to guns by merely "pointing to [the challenger's] own violent past." 616 F.3d at 693.

And as the United States District Court for the District of Columbia explained upon the Supreme Court's remand in Heller, the Supreme Court has

> "permitted litigants to justify . . . restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001) (emphasis added) (internal quotation marks omitted); see also City of Los Angeles v. Alameda Books, 535 U.S. 425, 439-40 (2002) ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."); National Ass'n of Mfrs. v. Taylor, 582 F.3d 1, 15 (D.C. Cir. 2009) ("[Plaintiff] maintains that the congressional findings . . .

are insufficient to support [the government's asserted interest] and thus to satisfy strict scrutiny. Rather, there must be 'studies, statistics, or empirical evidence . . . .' We disagree."); National Cable & Telecommunications Ass'n v. FCC, 555 F.3d 996, 1000 (D.C. Cir. 2009) ("The Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws.") (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61 (1973)).

Heller v. District of Columbia, 45 F. Supp. 3d 35, 47-48 (D.D.C. 2014) (alterations in original), aff'd in part, rev'd in part on other grounds, 801 F.3d 264 (D.C. Cir. 2015).

Thus, our review of the post-Heller jurisprudence leads us to conclude that when reviewing under intermediate scrutiny Second Amendment challenges to laws regulating the manner of how firearms are borne, "courts have traditionally been more deferential to the legislature in this area." Norman, 159 So. 3d at 223. This is especially so when considering that "[r]eliable scientific proof regarding the efficacy of prohibiting open carry is difficult to obtain." Id. n.14. Therefore, we agree with the Fourth District and are satisfied that the State's prohibition on openly carrying firearms in public with specified exceptions—such as authorizing the open carrying of guns to and from and during lawful recreational activities— while still permitting those guns to be carried, albeit in a concealed manner, reasonably fits the State's important government interests of public safety and reducing gun-related violence.

Accordingly, we hold that section 790.053 survives intermediate scrutiny review and is not unconstitutional under the Second Amendment. Our review of section 790.053 does not end here, though, as we must also analyze whether section 790.053 is unconstitutional under Florida's freestanding constitutional right to keep and bear arms for self-defense.

## V. FLORIDA CONSTITUTIONAL CHALLENGE TO SECTION 790.053

We have already determined that Florida's Open Carry Law survives intermediate scrutiny when considering whether the law violates the Second Amendment. We next consider whether Florida's freestanding constitutional right to keep and bear arms for self-defense, subject to the explicit grant of legislative authority to regulate how those arms are kept and borne, provides more constitutional rights than provided by the Second Amendment. Norman contends that it does because article I, section 8, is part of the Florida Constitution's Declaration of Rights, "a series of rights so basic that the framers of our Constitution accorded them a place of special privilege." Traylor v. State, 596 So. 2d 957, 963 (Fla. 1992).

Significantly unlike other rights contained in Florida's declaration of rights, however, the plain language of article I, section 8, of the Florida Constitution explicitly authorizes the Legislature to regulate the manner of exercising the right to keep and bear arms for self-defense. Because we have already determined that

the Open Carry Law merely regulates one manner of carrying firearms in public, we reject Norman's argument that this law regulating how firearms are carried in public warrants strict scrutiny review under Florida's constitutional right. Accepting such an argument would render every law regulating the use and manner of firearms presumptively unconstitutional, thereby rendering meaningless the text of article I, section 8, authorizing the Legislature to regulate firearms.

Indeed, our conclusion that laws regulating the manner and use of firearms do not actually implicate Florida's freestanding constitutional right, triggering strict scrutiny review, is borne out by this Court's precedent upholding against constitutional challenges laws on the keeping and bearing of arms without subjecting the laws to any form of heightened scrutiny. See Rinzler, 262 So. 2d at 664 (upholding constitutionality of statute making it unlawful for any person to "possess[] or control any short-barreled rifle, short-barreled shotgun, or machine gun which is, or may readily be made, operable") (quoting § 790.0221, Fla. Stat. (Supp. 1970)); Nelson, 195 So. 2d at 856 (upholding constitutionality of statute making it unlawful for convicted felons to possess a pistol, sawed-off rifle, or sawed-off shotgun); Davis, 146 So. 2d at 895 (holding valid law making it a criminal offense to carry in one's manual possession a pistol, Winchester rifle or other repeating rifle in county without a license from county commissioners). Therefore, we conclude that section 790.053, which regulates one manner of

carrying arms in public, is not subject to strict scrutiny review. Accordingly, consistent with our conclusion that section 790.053 passes constitutional muster under intermediate scrutiny, and therefore does not violate the Second Amendment, we hold that section 790.053 does not violate article I, section 8, of the Florida Constitution under the same standard.

## CONCLUSION

We hold that section 790.053 does not unconstitutionally infringe on the Second Amendment right to bear arms, as interpreted by the United States Supreme Court in Heller and McDonald, or the Florida Constitution's freestanding right to bear arms subject to the Legislature's authority to regulate the use and manner of doing so. Because section 790.053 regulates only one manner of bearing arms and does not impair the exercise of the fundamental right to bear arms, we approve the Fourth District's well-reasoned decision in Norman upholding the constitutionality of section 790.053 under intermediate scrutiny.

It is so ordered.

LABARGA, C.J., and QUINCE, J., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because Florida's generally applicable ban on the open carrying of firearms is unjustified on any ground that can withstand even intermediate scrutiny, I dissent. I agree with the majority that "Florida's Open Carry Law is related to the core of the constitutional right to bear arms for self-defense," majority op. at 37, but I disagree with the majority's view that the statute " 'substantially relates' to the stated government purpose of public safety and reducing gun violence," id. at 42. I therefore would answer the first certified question in the negative. And I would decline to answer the remaining certified questions, which are rendered moot by a negative answer to the first question.

**I.**

Three elements of the Supreme Court's reasoning in District of Columbia v. Heller, 554 U.S. 570 (2008), illuminate the constitutional question here. The third element establishes that the Second Amendment right is a right to openly carry firearms.

As the underpinning for its decision invalidating a law prohibiting the possession of handguns in the home, the Court recognized that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects," id. at 593, and that the text of the Second Amendment—properly understood in historical context—"guarantee[s] the individual right to possess and

carry weapons in case of confrontation," id. at 592. The Second Amendment right thus encompasses "being armed and ready for offensive or defensive action in a case of conflict with another person." Id. at 584 (quoting Muscarello v. United States, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) (quoting Black's Law Dictionary 214 (6th ed. 1990))). This is reinforced by the statement in McDonald v. City of Chicago, 561 U.S. 742, 749-50 (2010), that Heller "held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." The "individual right to possess and carry weapons in case of confrontation," Heller, 554 U.S. at 592, to "be[] armed and ready for offensive or defensive action in a case of conflict with another person," id. at 584 (citation omitted), "for the purpose of self-defense," McDonald, 561 U.S. at 750, necessarily encompasses the right to carry arms in public. On this point, of course, the majority here does not disagree.

Second, in explaining the historical context bearing on the interpretation of the Second Amendment, Heller observed that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Heller, 554 U.S. at 626. Heller used this point to illustrate the broader point that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely

explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id.

Third, in conjunction with the point regarding the carrying of concealed weapons, Heller recognized that the pre-Civil War case law, which demonstrated "the public understanding of" the constitutional right to keep and bear arms "in the period after its enactment or ratification," id. at 605 (emphasis omitted), interpreted the right as a right to openly carry firearms. The Court characterized the examination of such case law as "a critical tool of constitutional interpretation." Id. In particular, Heller's analysis relied on two state supreme court decisions that address the right to open carry—Nunn v. State, 1 Ga. 243 (1846), and State v. Chandler, 5 La. Ann. 489 (1850).

Heller explained that in Nunn "the Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defence' and therefore struck down a ban on carrying pistols openly." Heller, 554 U.S. at 612 (emphasis omitted) (quoting Nunn, 1 Ga. at 251). Nunn stated that the state statute at issue "is valid" to the extent that it "seeks to suppress the practice of carrying certain weapons secretly . . . inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms." Nunn, 1 Ga. at 251 (emphasis omitted). But Nunn goes on to state "that so much of [the

statute], as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void." Id. (emphasis omitted).

Similarly, Heller relied on Chandler in which

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

Heller, 554 U.S. at 613 (quoting Chandler, 5 La. Ann. at 490). Chandler vindicated a state law prohibiting carrying concealed deadly weapons—that is, a deadly weapon "that does not appear in full open view." Chandler, 5 La. Ann. at 489. The court observed that the prohibition "became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." Id. at 489-90.

The Supreme Court's examination of Nunn and Chandler constituted a "critical," Heller, 554 U.S. at 605, element in Heller's interpretation of the meaning of the Second Amendment right to keep and bear arms. And both cases point strongly to the conclusion that the constitutional right is best understood historically as a specific right to carry arms openly. The Court's broad characterization of the Second Amendment right as "the right to keep and bear arms for the purpose of self-defense," McDonald, 561 U.S. at 749-50, cannot be

detached from this historical context.  For example, the right cannot be reduced to a right to carry long-guns based on the supposition that a broad prohibition of carrying handguns would not prevent the carrying of arms "for self-defense." Heller, 554 U.S. at 629.  Given the history-centered reasoning employed by Heller, it is sensible to "refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified."  Michael H. v. Gerald D., 491 U.S. 110, 127 n.6 (1989).  "[A]dopt[ing] the most specific tradition as the point of reference" helps avoid "arbitrary decisionmaking" by judges.  Id.  And, of course, the "most specific tradition," id., in this context is the tradition—exemplified in Nunn and Chandler—vindicating the right to openly carry firearms.[19]

## II.

The Florida statute challenged here collides with the Second Amendment right as understood in Heller.  And the majority's attempt to justify the law's interference with Second Amendment rights rests on a very slender reed.  The

---

19.  This does not mean that an ossified understanding of what constitutes "arms" should be adopted.  The characteristics of particular firearms were not a focus of the tradition.  Heller thus recognized that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  Heller, 554 U.S. at 582; see also Caetano v. Massachusetts, 136 S. Ct. 1027, 1027 (2016) (vacating decision that "upheld a Massachusetts law prohibiting the possession of stun guns").

justification cannot pass muster even under the intermediate scrutiny standard of review that the majority purports to apply.

In reviewing any law that impinges on Second Amendment rights it must be borne in mind that Heller rejected a "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " Heller, 554 U.S. at 634 (quoting id. at 689-90 (Breyer, J., dissenting)). Heller observed:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

Id. at 634-35 (emphasis omitted). Heller therefore also makes clear that rational-basis review "[can]not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." Id. at 628 n.27. "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the

separate constitutional prohibitions on irrational laws, and would have no effect." Id. But the majority here, while purporting to apply intermediate scrutiny, evaluates the challenged law in a manner that is not materially different from rational-basis review.

The justification relied on by the majority is ostensibly related to public safety concerns. There are two elements to the justification. Both are feeble. First, this reason is offered: "An armed attacker engaged in the commission of a crime, for example, might be more likely to target an open carrier than a concealed carrier for the simple reason that a visibly armed citizen poses a more obvious danger to the attacker than a citizen with a hidden firearm." Majority op. at 42 (quoting State's Answer Brief at 22). Second, it is suggested that the State is justified in displacing open carrying in favor of concealed carrying because "deranged persons and criminals would be less likely to gain control of firearms in public because concealed firearms—as opposed to openly carried firearms—could not be viewed by ordinary sight." Id.

These reasons may not be totally irrational, but they do not provide any substantial justification for the ban on open carrying. Such "speculative claims of harm to public health and safety" are "not nearly enough to survive the heightened scrutiny that applies to burdens on Second Amendment rights." Ezell v. City of Chicago, 846 F.3d 888, 890 (7th Cir. 2017). There is no substantial link between

the ban and public safety, and the State's speculation is no substitute for such a link.

The suggestion that someone committing a crime "might be more likely to target an open carrier than a concealed carrier," majority op. at 42 (citation omitted), is subject to the rejoinder that a criminal confronted with the presence of an open carrier may be more likely to leave the scene rather than face the uncertain outcome of exchanging gunfire with an armed citizen. In hostile encounters between armed individuals, the outcome is seldom certain, and even criminals can understand that fact. Many—admittedly not all—armed criminals will give a wide berth to someone they know to be armed. Likewise, speculating about the disarming of individuals who are openly carrying firearms by "deranged persons and criminals," id., is a grasping-at-straws justification.

The reality is that it is highly unlikely that these feeble proffered justifications had anything to do with the adoption of the statute banning open carrying. As the history recounted by the majority indicates, the ban was adopted in the aftermath of the Legislature's passage of the Jack Hagler Self-Defense Act, which broadly required the issuance of concealed-carry permits subject to narrow exclusions. See id. at 11-18. The ban on open carrying is best understood as the Legislature's response to the public concerns swirling around adoption of the concealed-carry law. To properly understand this legislative response, two

circumstances must be remembered.  First, the Legislature acted long before <u>Heller</u> was decided and thus at a time when the individual right to keep and bear arms was a hotly contested issue of constitutional law.  Second, then—as now—most individuals desiring to bear arms in public likely preferred concealed carrying to open carrying.

The Legislature therefore acted to address the issue of public carrying, considered constituent preferences regarding concealed carrying, and weighed competing concerns in a context in which the contours of the Second Amendment right were wholly unsettled.  Given this context, the Legislature opted for concealed carrying over open carrying.  More to the point, the Legislature decided that the sacrifice of open carrying was a necessary and appropriate response to the public opposition generated by the passage of the concealed-carry law.  But the legal landscape has now dramatically shifted.  <u>Heller</u> has settled that the Second Amendment protects the right of individuals to keep and bear arms.  And <u>Heller</u>'s historical analysis points strongly to the conclusion that the individual right includes the right to carry arms openly in public.

This truth should be acknowledged: opposition to open carrying stems not from concrete public safety concerns but from the fact that many people "are (sensibly or not) made uncomfortable by the visible presence of a deadly weapon." Eugene Volokh, <u>Implementing the Right to Keep and Bear Arms for Self-Defense:</u>

An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1523 (2009).  Of course, many people are made uncomfortable by the fact that others are permitted to keep and bear arms at all.  But contemporary sensibilities cannot be the test.  Such sensibilities are no more a basis for defeating the historic right to open carrying than for defeating the understanding that the Second Amendment recognizes the right of individuals to keep and bear arms.  "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."  Heller, 554 U.S. at 636.  And "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."  Id. at 634-35.

### III.

Florida's ban on the open carrying of firearms fails to satisfy the command of the Second Amendment, which is applicable to the States under the Fourteenth Amendment.  The decision of the Fourth District therefore should be quashed.[20]

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Statutory Validity

Fourth District - Case No. 4D12-3525

(St. Lucie County)

---

20.  Because the challenged statute is unconstitutional under the Federal Constitution, it is unnecessary to address the state constitutional claim.

Eric J. Friday of Fletcher & Phillips, Jacksonville, Florida,

    for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Consiglia Terenzio, Bureau Chief, and Heidi Lynn Bettendorf, Assistant Attorney General, West Palm Beach, Florida,

    for Respondent

Glenn Thomas Burhans, Jr. of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Tallahassee, Florida; and Deepak Gupta and Jonathan E. Taylor of Gupta Wessler PLLC, Washington, District of Columbia,

    for Amicus Curiae Everytown for Gun Safety

Jason Brent Gonzalez of Shutts & Bowen LLP, Tallahassee, Florida; and Robert Dowlut, Bethesda, Maryland,

    for Amicus Curiae National Rifle Association of America